AMERICAN GREETINGS CORP. and
CPG Products Corp., Plaintiffs,

v.

DAN–DEE IMPORTS, INC., Daniel
Ranzman and Lee Capozzi,
Defendants.

Civ. A. No. 83–4246.

United States District Court,
D. New Jersey.

Oct. 2, 1985.

Carol F. Simkin, Cowan, Liebowitz & Latman, P.C., New York City, Ronald Gould, Shanley & Fisher, Morristown, N.J., for plaintiffs.

Jesse Rothstein, Joel Lutzker, Amster, Rothstein & Engelberg, New York City, Robert Alvin Adler, Simon & Allen, Newark, N.J., for defendants.

## OPINION

SAROKIN, District Judge.

This matter is before the court on plaintiffs' motion for contempt and/or to amend the November 29, 1983 preliminary injunction of the court. Defendants here cross-move to vacate or narrow such injunction. Plaintiffs contend that defendants' sale of pastel colored stuffed animals with prominent pictorial designs on their stomachs or chests, *i.e.*, "tummy graphics," is likely to cause public confusion by indicating a connection with plaintiffs' line of Care Bear products. Defendants argue that their Goodtime Gang, including the bears originally enjoined, are not likely to be confused with Care Bears and that, if they are, the use of "tummy graphics" is functional and cannot be enjoined. Originally brought on by Order to Show Cause dated August 28, 1984, the instant matter was the subject of 6 days of hearings, commencing on December 17, 1984.

## FINDINGS OF FACT

### A. *Plaintiffs and their Care Bears*

Plaintiff American Greetings Corporation ("American") is an Ohio corporation with its principal place of business in Cleveland, Ohio. Founded in 1906, American is the largest publicly held greeting card company in the world, manufacturing and distributing greeting cards and related gifts and stationery products. Through its operation unit Those Characters From Cleveland ("TCFC"), American also licenses and supervises the marketing by third parties of commercial products, such as dolls, bed sheets, housewares and ready-to-wear products which embody or are derived from American's greeting card designs and/or new artwork created for such licensing. From the active licensing of such greeting card characters as Care Bears, Get Along Gang, Strawberry Shortcake and Ziggy, American benefits by deriving royalty income from the sale of products through third-party licensees. The increased popularity of American's characters appearing on licensed products in turn stimulates sales of American's own greeting cards and gift-related products.

American's co-venturer, plaintiff CPG Products Corp. ("CPG"), is a wholly-owned subsidiary of General Mills, Inc. CPG is a Delaware corporation with its principal place of business in Minneapolis, Minnesota. CPG is engaged in the development, manufacture and sale of a wide variety of toys and is one of the leading toy companies in the world. CPG's three operating divisions, Kenner Products, Parker Brothers, and Fundimensions, are assisted by the services of CPG's fourth division and development arm, the Marketing and Design Service Division ("MAD"). MAD has seventeen creative people whose function is to develop new concepts and to

design products to fill perceived needs in the toy marketplace. Plaintiffs contend that this development effort coincides with CPG's movement away from the sale of single item products towards a focus on multiple lines of toys which are related through a family of characters.

Prior to the creation and introduction of the Care Bears, the characters involved herein, CPG and American had launched a highly innovative and effective licensing program based on the character Strawberry Shortcake. The success of plaintiffs' Strawberry Shortcake program was well known within the industry.

The Care Bears were conceived in the first months of 1981, as part of the continuing joint effort of American and CPG to arrive at a suitable project to follow Strawberry Shortcake. Plaintiffs' goal was to create and market bears differently than it had ever been done before. Care Bears were designed with such features as jowly head shapes, pastel colors and other distinctive details. The most prominent of these distinctive features is the tummy graphic. According to plaintiffs, the role of the tummy graphic was multi-purpose, including giving each bear an individual personality and as a unifying feature which would distinguish the Care Bears line of products from other plush toys. The Care Bears tummy graphics are permanent and integral to the identity of the Care Bear characters as well as being the critical unifying element of the Care Bear family, and they communicate the emotional or personality message of each of the Care Bears and "inspire youngsters to play in a caring way."

Plaintiffs contend that what makes a Care Bear part of the Care Bear family, most basically, is the presence of the tummy graphic directly on the body of a pastel-colored animal. That plaintiffs intended the individual tummy graphics so affixed not only to identify the animal as a Care Bear, but to connote the particular personality and/or emotion associated with each Care Bear character is conceded by plaintiffs. Plaintiffs claim that Care Bears have the following distinctive elements:

1. pastel coloration;
2. an inverted triangular "jowly" shaped head;
3. heart-shaped paw pads;
4. a pear-shaped body;
5. an oval-domed shaped abdominal area;
6. a heart-shaped nose;
7. a tuft of hair atop the head;
8. a white plush abdominal area; and
9. tummy graphics.

Some of these features standing alone have appeared in the marketplace before. Lines of different pastel-colored stuffed animals, including lines of different pastel-colored stuffed bears are nothing new and had been frequently part of defendant Dan-Dee's product offerings in the past. An inverted triangular "jowly" head is similarly old and has been used by Dan-Dee and others in the past for stuffed bears. Heart-shaped paw pads are old and have been used in the past for stuffed bears. A pear-shaped body is old and has been used in the past by Dan-Dee and others for stuffed bears and animals. A heart-shaped nose is old and has been used by Dan-Dee frequently in the past. A white plush abdominal area is traditional for many stuffed animals and has been used frequently in the past by Dan-Dee. The use of graphics directly on the chest or "tummy" of a stuffed animal, including a stuffed bear are old and have been used by Dan-Dee and others in the past. Indeed, in other litigation plaintiffs themselves have recognized the prior utilization of "tummy" graphics. In *Wiley v. American Greetings Corp.*, 597 F.Supp. 736 (D.Mass.1984), plaintiffs were charged with infringement of Wiley's trademark rights in a red heart applied to the chest of a teddy bear. Plaintiffs successfully moved for summary judgment against Wiley on the grounds, *inter alia*, that the use of heart graphics on the chest area of a teddy bear was so common that it was impossible for anyone to obtain trademark rights in such graphics. William M. Hart, Esq., of Cowan, Liebowitz

and Latman, who represent American and CPG, both in *Wiley* and in this action, filed an affidavit in *Wiley*, stating:

> Although plaintiff [Wiley] has, therefore, not in any way used or promoted this heart design as a trademark, it is also apparent that even if it had, no trademark-type rights could be acquired in that design as applied to teddy bears, given the numerous third party uses of heart-shaped designs on the chests of teddy bears discussed below.

The subject of each of the "tummy graphics" used on the Care Bears was consciously selected from traditional symbols which best convey the emotional or personality message of each bear. This fact is emphasized in plaintiff's licensing manual: "Each Care Bear wears a symbol on its tummy which *best* explains its chosen mission." The graphics on the tummies of the first ten Care Bears and the messages they purportedly convey are listed below:

| NAME | GRAPHIC | MESSAGE |
| --- | --- | --- |
| Tenderheart Bear | Heart | Love and Caring |
| Funshine Bear | Smiling Sun | Fun and Laughter |
| Good Luck Bear | Four Leaf Clover | Good Luck |
| Birthday Bear | Birthday Cake | Happy Birthday |
| Friend Bear | Two Smiling Daisies | Friendship |
| Grumpy Bear | Rain Cloud | It's OK to be out of Sorts |
| Cheer Bear | Rainbow | Cheer and Hope |
| Bedtime Bear | Crescent Moon and Star | Sweet Dreams |
| Love a Lot Bear | Two Hearts Touching | Romantic Feelings |
| Wish Bear | Wishing Star | Wishes and Hope |

The professed function of the Care Bears products is "to help children and adults express their feelings and share them with others" and the role of the tummy "graphics . . . to convey the message of simple, human feelings—cheer, happiness, love and tenderness."

Although plaintiffs concede that many of the individual tummy graphics existed in the past, they claim that theirs were selected to facilitate plaintiffs' plan to give each Care Bear a separate personality/emotion which plaintiffs took great pains to convey to the consumer not just through the toys alone, but through plaintiffs' entire marketing plan for the product. This included advertising, television specials, cross-sell booklets, and publishing, all of which served to familiarize the consumer with the Care Bear characters and the fantasy world CARE–A–LOT in which they live. Plaintiffs concede that when the Care Bear graphics were selected, they were the best vehicles to facilitate the conveyance to the public of the individual personalities/emotions of each Care Bear character. However, plaintiffs insist that the key word is *"facilitate,"* and that it was plaintiffs' advertising and marketing efforts that made each of the graphics as used on plaintiffs' products "really stand for something," and gave the child a fantasy world in which to play.

The television and print advertising and the marketing of Kenner's Care Bears strongly emphasize the Care Bears trademark and logo. The Care Bears trademark appears ten times on the box in which the Care Bears plush toys are sold and the Care Bears logo appears four times. Both the trademark and logo appear prominently on in-store displays which Kenner supplies free of charge to retailers in order to encourage retailers to set up separate "end of aisle" Care Bears sections. Each Care Bears plush toy is sold with a "cross-sell booklet" attached to the bear which has the Care Bears trademark in large type across the front. As a seal of authenticity, each Care Bears plush toy has a Care Bears "tushie tag" with the trademark Care Bears inscribed across it, permanently af-

fixed to its rump. The purpose of the Care Bears "tushie tag" is to further emphasize the Care Bears trademark and to distinguish authentic Care Bears products from those of alleged imitators.

In order to introduce the Care Bear line of products, plaintiffs gave previews, from late 1981 through June of 1982, to many potential licensees. Plaintiffs exercised discretion in the selection of licensees in order to insure that uniform quality standards were met. This was important not only to plaintiffs but to each of the licensees because poor quality control on the part of any one of their products could adversely reflect on the entire Care Bear line. Currently, there are sixty different companies which, under license from American, the copyright owner of Care Bears, manufacture a wide variety of products which feature the Care Bears characters. Although Care Bear toys, greeting cards and other products were not slated for formal introduction until February, 1983, plaintiffs began to make presentations of the toy line, along with plaintiffs' plans to back the Care Bear products with substantial advertising dollars, to approximately fifty major retailers throughout the country during the summer and fall of 1982. These included such retailers as K–Mart, Dayton Hudson, Sears, Penneys, Mervins, Bradlees, Rideway and Target.

By mid to late 1982, the toy industry was well aware of the Care Bears and their upcoming introduction into the marketplace. In October, 1982, over 300,000 copies of American's introductory Care Bears brochure, entitled "Introducing a Story About Love," featuring color artwork of the initial ten Care Bears characters and listing the licensees already committed to the project, were inserted in major trade publications. Two thousand additional copies were distributed directly to leading retail executives in the mass retailing field at approximately the same time. In the fall of 1982, newspaper and magazine articles began reporting the upcoming introduction of Care Bears, which were by then already perceived as the newest sensation in the toy and character licensing field. These articles were often accompanied by pictures of the Care Bears. Also in the fall of 1982, plaintiffs distributed to the trade thousands of copies of at least two additional Care Bear introductory catalogs. These catalogs included photographs of prototypes of the plush Care Bears which were not yet at retail and explained plaintiffs' 1983 marketing plan and schedule for the forthcoming television special. In late 1982, American issued its 1983 Care Bear catalog to its sales force to use in presenting the Care Bears to their customers.

In February, 1983, plaintiffs' Care Bear toy line was formally introduced at the New York Toy Fair. Kenner's 1983 catalog, featuring six Care Bear plush animals in two sizes (the larger of which is sold in an open, platform-type box designed to give good visibility to the tummy graphics), ten Care Bear poseables and ten miniatures, and various other Care Bear accessories and toys, were distributed at Toy Fair. Included among the six initial 13" plush Care Bears were Grumpy Bear, Cheer Bear, Funshine Bear and Friend Bear. These, along with the rest of the toy line and other licensed Care Bear products, were available on the retail shelves of plaintiffs' customers, which included major toy stores such as K–Mart, Child World and Toys-R-Us, in the spring of 1983. In some stores all Care Bear products are displayed together; however, in others, Care Bear products were separately dispersed throughout the store in the department or area designated for those types of products, along with the competitive products of other companies.

Further Care Bear publicity and advertising continued in early 1983. For example, on February 28, 1983, New York magazine published an article entitled "Where The Toys Are," featuring a color photograph of Kenner's plush Care Bears. In April, 1983, a one-half hour television special featuring the Care Bears, entitled "Care Bears in the Land Without Feeling," was broadcast nationally. Beginning in April 1983, plaintiffs commenced their national television advertising campaign for Care Bears which

included seven different thirty-second televised commercials, three of which were devoted exclusively to the plush toy Care Bears marketed by Kenner. These commercials, as well as similar ones, aired nationally in 1984.

Fearing copying of the Care Bears' line, plaintiffs widely published in virtually every applicable trade journal, a notice warning the trade that plaintiffs would vigorously pursue anyone who copied not only Care Bear characters and names, but the tummy graphics as well, because plaintiffs considered these to be their property. This warning was first published in March and April, 1983 and republished in the fall of that year. In June, 1983, print advertisements featuring the Kenner plush toys appeared in a number of national magazines including *Good Housekeeping, Family Circle, Seventeen, Redbook, Parents* and *Working Mothers*, reaching literally millions of subscribers. In 1983, plaintiffs and their licensees spent approximately 8–10 million dollars advertising Care Bear products to the consumer, 6 million of which was for the Kenner television commercials described above. In 1984, the total figures rose to the 10–15 million dollar range.

As a result, plaintiffs' Care Bear products were, almost immediately, an immense success. *Toy and Hobby World* trade magazine, from the July 1983 issue of that magazine and continuing thereafter, has consistently included Kenner's Care Bear plush toys in its monthly "Toy Hit Parade" of the most actively sold toys at retail. Beginning in October 1983 and continuing from time to time thereafter, *Playthings*, another leading trade magazine, also included the Care Bears in its corresponding section entitled "What's Selling". Retail sales of plaintiffs' Care Bear products and those of their licensees amounted to approximately 250 million dollars in 1983 alone. This includes approximately 28 million dollars in retail sales of plush Care Bears; another 28 million dollars of Kenner's other Care Bear toys, such as miniatures, poseables and accessories, and 35

million dollars at wholesale of greeting cards depicting the Care Bear characters.

As a result of this massive advertising campaign and the 1983 television special, as well as the broad range of different Care Bear products available at retail, and the enormous sales of such products, including plush toys, the public has come to associate the overall appearance of plaintiffs' pastel-colored plush toys with plaintiffs' Care Bears. Tummy graphics are essential to that appearance. This association was fixed in the public's mind by mid-1983, well before defendants' marketing of its Goodtime Gang and other plush toys with tummy graphics, and has continued to date.

In order to expand on the popularity and demand already created for the Care Bears, plaintiffs, in 1984, increased the 13″ plush line from six to thirteen different characters, all having the same essential design features of the original plush line, including a different tummy graphic for each character. These new characters, along with the original characters, were featured in a second thirty-minute Care Bear special entitled, "Care Bears Battle the Freeze," which was nationally broadcast in the spring of 1984. Plaintiffs were more successful with sales of Care Bear products in 1984 than they had been in 1983. Total retail sales of all licensed products, including six million plush Care Bears equalling about 100 million dollars in retail sales, reached approximately 500 million dollars. Orders for plush Care Bears in 1983 and 1984 exceeded productive capacity. Care Bears will be the largest of Kenner's toy lines in 1985, with sales projections for 1985 exceeding 1984 sales. Kenner expects to produce more Care Bear plush toys in order to meet this demand.

The 1985 line will also include the Care Bear Cousins, on which plaintiffs began work in the spring of 1983, as well as additional Care Bear characters. A brochure announcing the Cousins was distributed to the trade in the fall of 1984, and the Cousins were introduced to the public in a major motion picture released in the spring of 1985. In the film, these animals become

Care Bear Cousins only when they earn their tummy symbols. As with all the Care Bear characters, Cousins are tied to the Care Bear family by the presence of many of the same distinctive design features, including the prominent use of tummy graphics.

### B. *Defendants and their Good Time Gang*

Defendant Dan-Dee Imports, Inc. ("Dan-Dee") is a New Jersey corporation with its principal place of business in Jersey City, New Jersey. Dan-Dee and its president, defendant Daniel Ranzman, have been in the toy business for twenty-nine years, the past eight of which have been in the plush toy field. Mr. Ranzman is president and sole stockholder of Dan-Dee, and he has final decision-making authority with respect to new product development. Mr. Ranzman claims that he conceived the idea for the product at issue herein and had sole responsibility for approval and selection of these products and their packaging at each stage of their development and in their final version. Defendant Lee Capozzi is a full-time employee of Dan-Dee and its sole designer. Mr. Capozzi joined Dan-Dee as Director of Marketing in May, 1983. Prior to joining Dan-Dee, Mr. Capozzi had been the chief designer for the Applause Division of Knickerbocker Toys. At that time, Knickerbocker, which has since been acquired by Hasbro, was the largest manufacturer of stuffed toys in the world. Preceding his tenure at Knickerbocker, Mr. Capozzi was head designer for Russ Berrie Company, where he worked from 1979 to 1981. Russ Berrie is a leading plush toy manufacturer, with sales of over 30 million dollars at that time.

Defendants offered testimony that in May or June, 1983, Mr. Capozzi personally designed the Goodtime Gang products at issue in response to Mr. Ranzman's idea "to design an assortment of animals with decorations," and that the designs for the Goodtime Gang and their graphics were independently created by Mr. Capozzi based upon his considerable experience in the plush industry. Mr. Capozzi testified that he had used rainbows, stars, clouds, flowers, hearts and the sun as graphic motifs many times in the past since they are "naturals" and children commonly associate them with happiness, and that he placed the graphics on the stomach area of the Goodtime Gang animals since this is the most prominent and best location to show off the design. He further testified that he designed the Goodtime Gang animals with white plush stomachs, since this color works best as a background for the graphics.

The court does not accept defendants' contention that their line of competitive products was developed without knowledge of or reliance upon plaintiffs' similar line. The design, dress and packaging of defendants' line results in a similarity to plaintiffs' which defies coincidence and belies the independent creation which defendants assert. The court specifically finds that defendants' product line was developed with knowledge of plaintiffs' product and appearance and reliance thereon.

Although defendants were in the plush toy line for years, they never sold the products here in issue. Dan-Dee imports plush animals with approximately 550 items in its line, selling principally to large mass merchandisers such as K–Mart, Zayres, Bradlees and Walgreens. Dan-Dee offers a wide variety of plush products and is not looking for "home runs" with any particular design. Dan-Dee's annual wholesale sales in 1984 were approximately 40 million dollars; the retail value of such sales was approximately 80 million dollars. It does no trade or consumer advertising. Dan-Dee's products are manufactured by vendors in Taiwan and China pursuant to specifications. Both defendants Ranzman and Capozzi make four to six fairly lengthy trips to the Far East to confer with their Far East suppliers, including a company called MG, which acts as an agent for defendants in developing Dan-Dee's products. It is principally during these trips that Dan-Dee's extensive design work for its new products takes place. Each year, Dan-Dee essentially redesigns all of its

product lines. The magnitude of Dan-Dee's annual design efforts is illustrated by the fact that in 1983, Mr. Capozzi designed approximately 1000 different stuffed animals; approximately 1200 were designed in 1984. Each of these designs goes through a refinement process in which five or six different samples are made over the course of weeks or months, each sample somewhat changed from its predecessor.

Before defendants had any investment or inventory in the items at issue, this suit was commenced and defendants were temporarily restrained on November 7, and preliminarily enjoined on November 29, 1983, from, *inter alia,* the use of various graphic designs on the chest/stomach area of plush bear toys. Notwithstanding the court's Opinion and the injunction, defendants proceeded to sell four other "Goodtime Gang" products (a monkey, a raccoon, a cat and a dog), in two sizes, which were shipped from Taiwan commencing in January, 1984, and have the same or similar pastel colors, and the same or similar tummy graphics. During 1984, defendants added further products to the Goodtime Gang "assortment," on an evolutionary basis. Also at various times during 1984, and apparently continuing to date, in disregard of plaintiffs' claims, defendants shipped additional pastel-colored plush animals with the same basic characteristics as the Goodtime Gang, including the use of tummy graphics. Most of the toys at issue were never revealed in any of defendants' catalogs. Defendants admit that Dan-Dee made a decision to offer the non-bear products with graphics as a line under the designation New Goodtime Gang. The New Goodtime Gang plush animals are a pastel-colored assortment, including a raccoon, a monkey, two styles of dog, and a mouse, but do not include any teddy bears. Defendants used graphics including a smiling sun and cloud, a smiling sun and rainbow, a smiling flower, a smiling moon and star, an ice cream cone, a pair of smiling hearts, and a pair of blue birds sitting atop a heart.

The larger size New Goodtime Gang plush toys are sold in individual yellow and lavender closed-top shadow boxes. The New Goodtime Gang boxes are marked with both the trademark, The Goodtime Gang, and the company name, Dan-Dee Imports. In the smaller size, the New Goodtime Gang is displayed in a large yellow, counter-top bulk display box, having a large multicolored header card, marked with the Goodtime Gang trademark and the name Dan-Dee. Defendants claim that the New Goodtime Gang plush animals themselves are plainly distinguishable from the Care Bears and are largely without the design features which characterize the "Care Bears" look in that:

1. The Care Bears plush toys have a triangular-shaped, "jowly" head. In contrast, the New Goodtime Gang plush toys have generally round or oval heads.

2. The Care Bears have heart-shaped rear paw pads. In contrast, the New Goodtime Gang plush toys have oval rear paw pads with no graphic symbols.

3. The Care Bears plush toys uniformly have heart-shaped noses. In contrast, the New Goodtime plush toy figures have generally oval noses.

4. The Care Bears plush toys are two-toned, *i.e.,* a single pastel shade and white. In contrast, the New Goodtime Gang plush toys are three-toned, *i.e.,* two colors and white.

5. The Care Bears plush toys uniformly have a round white patch on their front. In contrast, the New Goodtime Gang figures do not have a round frontal patch; they are white across their entire front panel and seat.

6. The Care Bears plush toys uniformly have bulbous pear-shaped bodies. In contrast, the New Goodtime Gang figures have generally cylindrical bodies.

7. The Care Bears plush toys uniformly have a red heart-shaped "tushie patch." In contrast, the New Goodtime Gang figures have no such patch.

8. The Care Bears plush toys are bears. In contrast, the New Goodtime Gang fig-

ures are a raccoon, monkey, cat, dog and mouse.

9. The Care Bears plush toys have large and anatomically-detailed eyes. In contrast, the New Goodtime Gang plush toys have small, button-like eyes.

10. The Care Bears plush toys each have a tuft of hair atop their heads. In contrast, the New Goodtime Gang figures have no hair tufts.

11. The Care Bears plush toys have a very large head relative to their body size. In contrast, the New Goodtime Gang plush figures have a small head-to-body size ratio.

12. The Care Bears have "tummy graphics" of a variety of pictorial subjects expressed in artistry created for plaintiffs. In contrast, the New Goodtime Gang "tummy graphics" are of a clearly distinguishable artistic expression created for Dan-Dee and, in many cases, are of different pictorial subjects.

Defendants insist that only after this court reached a legal determination relating to the bears did Mr. Ranzman consider offering the non-bear items. In early February, 1984, when U.S. Customs informed American that Dan-Dee was importing various stuffed animals with tummy graphics, plaintiffs put defendants on notice that defendants were proceeding at their own risk. Defendants claim that plaintiffs had actual knowledge of the New Goodtime Gang products prior to February, 1984, and that such knowledge dated back to December, 1983, when the New Goodtime Gang products were first manufactured by Well World. The date upon which plaintiffs became aware of the New Goodtime Gang plush toys has not been clearly established in the record, and the court can make no specific finding regarding it. Thus, the court cannot characterize plaintiffs' action in bringing this motion as prompt, nor find that delays, if any, limit plaintiffs' rights if they otherwise exist.

As previously stated, the court rejects defendants' claim that they designed their product line without reference to or copy-

ing of Care Bears. Defendants had heard of Care Bears prior to creation of the Goodtime Gang. Mr. Ranzman saw plaintiffs' Introductory Brochure, as well as plaintiffs' notices warning the trade that they would sue those who adopted the use of tummy graphics. Moreover, the Goodtime Gang was manufactured in the same factory as plaintiffs' "Care Bears," which were in actual production in early 1983.

### C. Survey Research on Likelihood of Confusion

As to the issue of confusion, plaintiffs' counsel prepared a survey questionnaire to determine whether the public mistakenly believes that defendants' Goodtime Gang is associated with Care Bears, and comes from the same source. The survey was originally implemented by an outside survey company, Wolf-Altschul/Callahan, which hired another company, Stewart Surveys, to conduct the actual survey at their permanent facility at the Woodbridge Mall in New Jersey over the 1984 Labor Day weekend. The survey was replicated in February, 1985, in Chicago, Illinois and Sacramento, California; a total of 300 mothers of daughters ages 4–12 were interviewed. When presented with four Goodtime Gang products in their boxes, these mothers were asked, "What other stuffed toys, if any, do the people who make these stuffed toys also make?" Forty-two per cent of the 300 women interviewed answered "Care Bears" or a response which included "Care Bears," fifty per cent said they did not know, and eight per cent had other responses. These responses are accurately reflected on questionnaire sheets which were completed during the interviews by interviewers who were unaware of the purpose of the survey, who the actual client was or that the survey was for litigation.

Neither Wolf/Altschul/Callahan, Stewart Surveys, nor any other outside professional having experience in the design of consumer surveys had any role whatsoever in the design of the survey, which was entirely done by plaintiffs' counsel. While

not dispositive, this fact renders plaintiffs' survey somewhat less weighty than it might otherwise be. Moreover, the only survey expert who testified with regard to plaintiffs' survey, Dr. Sidney Lirtzman, was of the opinion that plaintiffs' survey had absolutely no value. Dr. Lirtzman explained in detail the basis for his conclusions, including the fact that the questions asked were biased and that the survey itself was performed in a haphazard and unprofessional manner. Accordingly, the court gives little weight to plaintiffs' survey.

Defendant's expert, Dr. Lirtzman, independently designed and conducted two surveys, one of girls ages six to twelve and the other of mothers of girls ages six to twelve, to test whether there was any confusion under marketplace conditions between the New Goodtime Gang products and the Care Bears products. In each survey, the respondents were shown a display of four pairs of stuffed toys comprising Care Bears, New Goodtime Gang, Snoopy and generic teddy bears. This display, which included the products as actually packaged, purported to duplicate a realistic buying situation. The girls were asked to point to those of the four products which they knew and as to each of those, were asked what they would ask their mothers to buy them if they wanted that product. The mothers were asked which of the four products they would buy if their daughter asked them for a Care Bear stuffed toy, a Goodtime Gang stuffed toy, a Snoopy stuffed toy, and a teddy bear stuffed toy, by name. The results of these two surveys do not establish that there was no confusion between the Care Bears and New Goodtime Gang, either by the children or their mothers. Rather, in the court's view, this survey tested the participants' ability to read and little else. To put the products side by side and ask for a selection to be made by product name, when the product name appears on the package does not adequately test the existence of confusion. The questions themselves suggest differentiation and not similarity or identity: the participants are alerted to a difference and

can find it simply by reading the package. The test does not simulate actual buying habits. Plaintiffs' survey, on the other hand, while not projectible because the respondents were not randomly selected, and despite counsel's authorship, is entitled to some slight weight, particularly as it confirms the court's own finding, independently reached, that there is a likelihood of confusion as to source of defendants' Goodtime Gang and similar products with plaintiffs' products.

The court accords no weight to the other surveys done by Dr. Lirtzman or to his opinions based on those surveys. Dr. Lirtzman admitted that these surveys were testing only whether or not the products themselves would be confused and that he had formed no opinion as to whether people would believe that Care Bear and Goodtime Gang have a common manufacturer or are both licensed by the same people. As such, these surveys have no relevance to the secondary meaning issue. Additionally, these surveys were side-by-side comparisons of Care Bear and Goodtime Gang products. They offer no data on whether there would be any confusion, even of the limited kind on which Dr. Lirtzman was attempting to focus, were the public to encounter the Goodtime Gang in a store which does not have Care Bears, or if encountering versions of the products which are sold unboxed.

### D. *Factual Conclusions*

Based on the foregoing, the court finds that defendants knew of the Care Bears and deliberately set out to copy the most salient features of the Care Bears, in order to trade on plaintiffs' success. The obvious similarity of the products in shape, color, and size, the similarity of the graphic symbols and the manner of their use, for defendants' prototype bear and box for the original Goodtime Gang, all lead the court to find that defendants intended to confuse the public into believing their toys were sponsored by, connected with or associated with plaintiffs' Care Bears. The court further finds that defendants had the same

intent in developing and selling the non-bear plush items, the "New" Goodtime Gang.

The court finds that the public will believe that various stuffed animals, regardless of their genus, which have certain design characteristics in common with Care Bears, and now Care Bear Cousins, will be confused as part of the Care Bear family of products. Persons buying the non-bear Goodtime Gang are likely to believe that they are buying a product manufactured by the same company that manufactured and sold the Care Bears and now the Care Bear Cousins. Both defendants and their customers treated the "New" Goodtime Gang as the same product as, and a ready substitute for, the enjoined bears. Both were given the same name and style numbers. Virtually all orders for the bears were filled with defendants' "New" Goodtime Gang products. Indeed, defendants admitted that this was their expectation. Plaintiffs are seriously harmed by the sale of defendants' Goodtime Gang, which will be mistaken as an authorized part of the Care Bear family. The differences in the packaging or company name will not put the public on notice that the products are unauthorized. Clearly, if Kenner's plush Care Bear is not available, consumers are more likely to purchase an imitation rather than waiting for the real thing. Thus, defendants' sales of their Goodtime Gang will deprive plaintiffs of eventual, if not current, sales. Over and above lost sales, plaintiffs lose royalty income because defendants benefit from the association with Care Bear free of charge. American also loses the confidence of its licensees, such as Kenner, which commit to the product based on a promise of exclusivity. Finally, plaintiffs risk loss of public confidence since defendants' products are not subject to plaintiffs' quality control standards.

██ Although the court has found defendants to have infringed, it does not find them presently guilty of contempt for all infringing products. Because of the confusion regarding the scope of the order, the court cannot find that defendants were in contempt of court for the pre-September, 1984 marketing of the New Goodtime Gang. In order for the court to hold defendants in contempt, there must be a clear violation of the court's order. In this application plaintiffs seek expansion of the existing order, thereby conceding that it requires further amplification and amendment to include other than defendants' bear products. Under those circumstances, it would be inappropriate for the court to hold defendants in contempt of an order which the plaintiffs themselves concede requires expansion and clarification. Nor does the court find clear and convincing evidence of shipments of defendants' products between September 6 and 10, 1984, warranting contempt of the September 14, 1984 Order. However, as discussed, *infra* at 1226, the court finds defendants' sales of its K11 bears to be in violation of the November, 1983 Order of the court and its K11 dogs to be in violation of the parties' September, 1984 Consent Order. To that limited extent only, it finds defendants in contempt of court.

## CONCLUSIONS OF LAW

██ This action is brought under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), which states

Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that

he is or is likely to be damaged by the use of any such false description or representation.

This section created a federal cause of action for unfair competition, *Williams v. Curtiss-Wright Corp.*, 691 F.2d 168, 172 (3d Cir.1982); *L'Aiglon Apparel v. Lana Lobell, Inc.*, 214 F.2d 649 (3d Cir.1954), which cause of action is governed by the same analysis that prevails with respect to the New Jersey law of unfair competition. *Ciba-Geigy Corp. v. Bolar Pharmaceutical Co., Inc.*, 747 F.2d 844, 854 and n. 7 (3d Cir.1984), *cert. denied,* — U.S. ——, 105 S.Ct. 2678, 86 L.Ed.2d 696 (1985), citing *SK & F Co. v. Premo Pharmaceutical Laboratories*, 625 F.2d 1055, 1065 (3d Cir.1980). *See also United States Golf Association v. St. Andrews Systems, Data-Max, Inc.*, 749 F.2d 1028, 1032 n. 6 (3d Cir.1984). Hence, under both federal law and the state law here at issue, plaintiff must show

> (1) that an imitated feature of the product is non-functional, (2) that the imitation is likely to cause confusion as to the product's origin, and (3) that the product has acquired secondary meaning.

*Ciba-Geigy, supra,* 747 F.2d at 850 (citing cases). *See also Freixenet, S.A. v. Admiral Wine & Liquor Co.*, 731 F.2d 148, 151 (3d Cir.1984). *SK & F, supra,* 625 F.2d at 1062–63, citing Restatement of Torts § 711(c) (1938). The Lanham Act itself was designed to protect consumers and commercial interests from the effects of false advertising, counterfeit and imitated marks and false descriptions, *i.e.,* "to protect the right of the consumer to be told the truth." J. McCarthy, *Trademarks and Unfair Competition*, § 27:3, at 246–47 (1973). As a remedial statute, it is to be broadly construed. *Thorn v. Reliance Van Co., Inc.*, 736 F.2d 929, 932–33 n. 5 (3d Cir.1984).

### A. *Functionality*

 The Supreme court has summarized the functionality inquiry succinctly: "In general terms, a product feature is functional if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *Inwood*

*Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 850–51 n. 10, 102 S.Ct. 2182, 2186–87 n. 10, 72 L.Ed.2d 606 (1982), citing *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 232, 84 S.Ct. 784, 789, 11 L.Ed.2d 661 (1964); *Kellogg Co. v. National Biscuit Co.*, 305 U.S. 111, 122, 59 S.Ct. 109, 115, 83 L.Ed. 73 (1938). More recently, the Court of Appeals for the Third Circuit has explicated the purpose and nature of the non-functionality requirement of federal and state law.

> Under both New Jersey law and Federal law, the functional aspects of a product or service may not be protected under trademark law, or under the related unfair competition doctrines based on possible confusion as to the source of origin of the products or services. The rule reflects a balancing of divergent social interests. The use of "non-functional" features of a product or service to identify its source is legally protected against imitation by competitors because the value of such features in identifying the source of the goods or services outweighs the social interest in allowing competitors to copy them. Functional features on the other hand, may not be legally protected methods of identification, regardless of their association with the original manufacturer, because their usefulness in identifying the source of the product or service is outweighed by the social interest in competition and improvements, which are advanced by giving competitors free access to those features.

The "functionality" of a feature of a product or service cannot be determined by the application of a mechanical test. Although various forms of the inquiry have been articulated, the essence of the question is whether a particular feature of a product or service is substantially related to its value *as a product or service, i.e.,* if the feature is part of the "function" served, or whether the primary value of a particular feature is the identification of the provider. Several courts have noted that the key policy

served by barring the use of functional features for identification is the policy favoring competition, and that the "functionality" inquiry must be addressed in light of this policy.

*United States Golf Association, supra,* 749 F.2d at 1032–34 (citations and footnotes omitted) (emphasis in original). Hence, "[p]roof of nonfunctionality generally requires a showing that the element of the product serves no purpose other than identification." *Keene Corp. v. Paraflex Industries, Inc.,* 653 F.2d 822, 826 (3d Cir. 1981), quoting *SK & F, supra,* 625 F.2d at 1063. Color, for example, may be functional, *see, e.g., Norwich Pharmacal Co. v. Sterling Drug, Inc.,* 271 F.2d 569, 572 (2d Cir.1959) (pink color of Pepto-Bismol may function to soothe patient's suffering), or it may not, *see, e.g., Ciba-Geigy, supra,* 747 F.2d at 850; *Ideal Toy Corp. v. Plawner Toy Manufacturing Corp.,* 685 F.2d 78, 81 (3d Cir.1982); *SK & F, supra,* 625 F.2d at 1064, depending upon whether its choice was "arbitrary" or "utilitarian." *Keene Corp., supra,* 653 F.2d at 826. Normally, a feature can be said to be functional if it is compelled by, for example, "medical or business considerations," *Ciba-Geigy, supra,* 747 F.2d at 850, and, as such, has become standard in the industry. *United States Golf Association, supra,* 749 F.2d at 1034; *SK & F, supra,* 625 F.2d at 1064. Indeed, to the extent that certain features are standard, they facilitate comparability between products and thereby benefit consumers. *United States Golf Association, supra,* 749 F.2d at 1034.

▮ Here, the court finds many features of plaintiffs' product to be functional: most notably, it finds tummy graphics, in general, to serve a "purpose other than identification," *i.e.,* the purpose of communicating the particular personality of each of the Care Bear characters, and to convey an emotional message through such personality. Plaintiffs' contention that tummy graphics are not essential to the use or purpose of a plush toy because they do not enhance their "hugability," ignores the fact that Care Bears were designed and are marketed to fulfill a function other than mere "hugability." Indeed, the fact that they do so has been critical to their enormous success. It simply cannot be gainsaid that the presence of tummy graphics "affects [the] purpose, action or performance" of Care Bears, Restatement of Torts § 742, *cited in Keene Corp., supra,* 653 F.2d at 824, and that, if omitted, something of substantial value, perhaps even the very essence of the Care Bear, would be lost. *See* Restatement of Torts § 742 comment a, *cited in United States Golf Association, supra,* 749 F.2d at 1033 n. 7. Moreover, the fact that, as the court has found, tummy graphics are nothing new in the stuffed toy industry, manifest the functionality of such feature: were there not a function associated with such graphics, it is difficult to understand why they would have been so common in the past. *See, e.g., SK & F, supra,* 625 F.2d at 1064.

The court also finds that the particular symbols chosen by plaintiffs for the tummy graphics are functional: they are common figures and are typically associated with the messages attributed to them by plaintiffs. *See Wiley v. American Greetings Corp.,* 762 F.2d 139, 142 (1st Cir.1985) (heart a common symbol). Indeed, the very fact that plaintiffs chose these graphics and explicitly linked them to particular messages demonstrates their functionality. That other symbols, or other designs, could connote other, or the same, emotions is, of course, irrelevant, *see Keene, supra,* 653 F.2d at 827, citing *Vaughan Novelty Mfg. Co. v. G.G. Greene Mfg. Co.,* 202 F.2d 172, 175–76 n. 10 (3d Cir.), *cert. denied,* 346 U.S. 820, 74 S.Ct. 34, 98 L.Ed. 346 (1953); defendants have the right to utilize such feature in the best possible way, so long as such utilization is functional. *See United States Golf Association, supra,* 749 F.2d at 1034. It is for this reason that placing such graphics on the stomach, and against a white background, is also a functional aspect of this functional feature—and hence, permissibly copied by competitors such as defendants.

▮ During the course of the hearing on this matter, and in the post-hearing

submissions of the parties, both sides have focused their functionality arguments on the tummy graphic feature of their products. The court here finds such feature to be functional. Other, particular features of plaintiffs' product might also be separated from the whole and found to be functional. To so analyze these products would, however, ignore the problem presented by this case. For, irrespective of the functional nature of any number of the features of plaintiffs' product, their combination, in a particular form, is not functional. There are, however, numerous possible designs for plush, pastel-colored teddy bears, or other animals, with tummy graphics. *See Ideal Toy Corp. v. Plawner Toy Mfg. Corp., supra,* 685 F.2d at 81. *Cf., Keene Corp., supra,* 653 F.2d at 827. Certainly such characteristics could be omitted, or altered, without causing a loss of something of essential value. *United States Golf Association, supra,* 749 F.2d at 1033. To thus require that the combination of such features not be slavishly copied would have no significant impact upon competition, the furtherance of which comprises "the key policy served by barring the use of functional features for identification." *Id.* at 1034. *See also Keene Corp., supra,* 653 F.2d at 827. This is particularly so in that the functions of the Care Bear here set forth, *i.e.,* the communication of messages, and "hugability," are not enhanced by the many other features which identify Care Bears as Care Bears. *See generally* 1 McCarthy, *Trademarks and Unfair Competition* § 7:26(c), at 238 (2d ed. 1984) ("... Functionality is generally defined in a strictly utilitarian sense. For example, it includes only those physical features of an article absolutely necessary to its use, like the cutting edge of a razor blade, as distinguished from its color, shape or design."). Nor does the fact that the overall look of the Care Bear is "aesthetically functional" remove plaintiffs' product from the protective scope of section 43(a) of the Lanham Act. As the Court of Appeals for the Third Circuit has written:

> The difficulty with accepting .... a broad view of aesthetic functionality, which re-

lates the doctrine to the commercial desirability of the feature at issue without consideration of its utilitarian function, is that it provides a disincentive for development of imaginative and attractive design. The more appealing the design, the less protection it would receive. As our ambience becomes more mechanized and banal, it would be unfortunate were we to discourage use of a spark of originality which could transform an ordinary product into one of grace. The doctrine of aesthetic functionality need not be construed in such a manner for it to fulfill its important public policy function of protecting free competition.

*Keene Corp., supra,* 653 F.2d at 825. Finally, even if every feature of plaintiffs' product were functional,

> The manufacturer of the competitive copy is, however, constrained to make reasonable efforts to avoid ... deception. If the articles are substantially identical in appearance, and other distinguishing features cannot be added to it, the appearance thereon of the name or trademark will suffice.... If it is impossible for the subsequent producer to devise distinguishing features for his article, so as to avoid confusion with the original, the "rights must be adjusted on equitable principles, having proper regard to the interests of both."

L. Altman, *Callman on Unfair Competition, Trademarks and Monopolies* § 19.-33, at 19–132 (4th ed. 1983) (footnotes omitted).

▮ The court thus concludes that tummy graphics on white backgrounds are functional, and that plaintiffs may not acquire monopoly protection of them from the Lanham Act. However, the Act does proscribe defendants' copying of plaintiffs' product in full: defendants' products could and should have been designed to minimize confusion with plaintiffs' products, by altering non-functional elements of their stuffed animals, or combining functional elements in a different manner. Because the parties have focused on tummy graph-

ics alone,[1] the court is unable to evaluate how this should be done, without running afoul of the functionality doctrine.

### B. *Secondary Meaning*

 The requirement that a product have "secondary meaning" has also been succinctly summarized by the Supreme Court. *Inwood Laboratories, supra,* 456 U.S. at 851 n. 11, 102 S.Ct. at 2187 n. 11: "To establish secondary meaning, a manufacturer must show that, in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." In determining the existence of secondary meaning, the court "may consider factors such as length of use, buyer association, extent of sales and advertising, and the fact of copying." *Freixenet, supra,* 731 F.2d at 152, citing *Ideal Toy Corp. v. Plawner Toy Mfg. Corp., supra,* 685 F.2d at 82; *Faberge, Inc. v. Saxony Products, Inc.,* 605 F.2d 426, 428 (9th Cir. 1979); *Locatelli, Inc. v. Tomaiuoli,* 129 F.Supp. 630, 634 (D.N.J.1955). *See also Ciba-Geigy, supra,* 747 F.2d at 851–52; *Boehringer Ingelheim v. Pharmadyne Laboratories,* 532 F.Supp. 1040, 1063 (D.N.J.1980); *Estate of Presley v. Russen,* 513 F.Supp. 1339, 1364–65 (D.N.J.1981). Of course, in order for plaintiffs to succeed, they must show that the Care Bears had secondary meaning prior to defendants' efforts to market the Goodtime Gang. *See Scott Paper Co. v. Scott's Liquid Gold, Inc.,* 589 F.2d 1225, 1231–32 (3d Cir.1978) (citing cases).

The secondary meaning attached to the Care Bear line is obvious as a result of the evidence adduced at the hearing of this matter. Nor do defendants seriously dispute it. Hence, the court has already found that "[a]s a result of [a] massive advertising campaign ... 1983 television special, as well as the broad range of different Care Bear products available at retail, and the enormous sales of such products, including plush toys, the public has come to associate the overall appearance of plaintiffs' pastel-colored plush toys with plaintiffs' Care Bears. Tummy graphics are essential to that appearance." *See supra* at 1212. Moreover, the court found such secondary meaning to exist "by mid-1983, well before defendants' marketing of its Goodtime Gang and other plush toys with tummy graphics, and has continued to date." *Ibid. See also American Greetings Corp. v. Dan-Dee Imports, Inc.,* Civil Action No. 83–4246, Bench Opinion at 7–8 (D.N.J. November 9, 1983). Finally, while not dispositive, the court's finding that defendants in fact copied plaintiffs' Care Bear design, *see supra* at 15, 19, "is itself persuasive evidence of secondary meaning," *Ideal Toy, supra,* 685 F.2d at 82, for if there were not value in the appearance of Care Bears,[2] then it would not have behooved defendants to copy them. *See Boehringer Ingelheim, supra,* 532 F.Supp. at 1064 (citing cases).

 In sum, plaintiffs' unprecedented sales and gargantuan advertising campaign created, in the mind of the public, an unbreakable link between the overall appearance of the Care Bears, and the source of that product, *i.e.,* plaintiffs. The fact of copying is further evidence of the success of plaintiffs in creating secondary meaning

---

1. There is some confusion regarding where the burden of proof lies with respect to functionality. "While some courts have indicated that in infringement litigation, plaintiff has the burden of proving non-functionality once defendant raises the issue, it would seem that once plaintiff proves distinctiveness (usually by evidence of secondary meaning), the burden should be on defendant to prove the affirmative defense of functionality since it is a public policy defense separate and apart from customer recognition." 1 McCarthy, *supra,* § 7:26, at 240–41 (footnotes omitted). Here, however, defendants have not pointed to functional features of plaintiffs' prod-

uct other than the tummy graphics, nor have plaintiffs demonstrated or attempted to demonstrate functionality as to any. Hence, the court is unable specifically to apply functionality doctrine beyond tummy graphics, though it finds much of the Care Bear appearance to be non-functional.

2. Having found tummy graphics to be functional, *see supra,* at 1219, the court here discusses only the secondary meaning of the Care Bears' overall appearance.

for such appearance. The court here does no more than merely recognize the Care Bear phenomenon; that phenomenon creates, in legal terms, "secondary meaning."

### C. *Likelihood of Confusion*

■ Likelihood of confusion is the "dispositive issue" in actions such as these. "Regardless of how much secondary meaning it possesses, a product's trade dress will not be protected from an imitator that is sufficiently different in its features to avoid such confusion." *Freixenet, supra,* 731 F.2d at 151. The Court of Appeals for the Third Circuit has enunciated the factors to be utilized in determining whether such likelihood exists. As applied herein, they are:

(1) the degree of similarity between the owner's [product] and the allegedly infringing [product]; (2) the strength of owner's [product appearance]; (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time the defendant has used the [product] without evidence of actual confusion arising; (5) the intent of defendant in adopting the [product appearance]; (6) the evidence of actual confusion; ... (8) the extent to which the targets of the parties' sales efforts are the same; (9) the relationship of the goods in the minds of the public because of the similarity of function; (10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market.

*Scott Paper, supra,* 589 F.2d at 1229, citing *Scarves by Vera, Inc. v. Todo Imports, Inc.,* 544 F.2d 1167, 1173 (2d Cir.1976); *Union Carbide Corp. v. Ever-Ready, Inc.,* 531 F.2d 366, 381–82 (7th Cir.), *cert. denied,* 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976). These factors "are helpful in arriving at a finding as to the likelihood of confusion," though they need not all be considered "when some are dispositive." *Freixenet, supra,* 731 F.2d at 151–52 (citing cases).

■ The court concludes that there is a significant likelihood of confusion between the products of plaintiffs and those of defendants. Certain factors have already been examined, and resolved in plaintiffs' favor: thus, the clear secondary meaning attributable to the overall appearance of plaintiffs' product, *see supra* at 1221–22, indicates a particularly "strong" product appearance, *i.e.,* "its tendency to identify the goods sold [with such appearance] as emanating from a particular, although possibly anonymous source." *Estate of Presley v. Russen, supra,* 513 F.Supp. at 1367, quoting *McGregor-Doniger, Inc. v. Drizzle, Inc.,* 599 F.2d 1126, 1131 (2d Cir.1979). *See also Caesar's World, Inc. v. Caesar's Palace,* 490 F.Supp. 818, 824–25 (D.N.J.1980) ("The fact that plaintiffs have spent millions of dollars on advertising and promotion contributes to the strength of their names and marks.") *See generally* 1 McCarthy, *supra,* § 15:3, at 666–68 ("It must be recognized that secondary meaning and likelihood of buyer confusion, although two separate legal issues, will be difficult to distinguish in viewing the evidence.").[3] Similarly, the court has already found, as a matter of fact, that defendants intentionally or knowingly copied the overall appearance of plaintiffs' product. *See Johnson & Johnson v. Quality Pure Manufacturing, Inc.,* 484 F.Supp. 975, 979 (D.N.J.1979) ("When a newcomer in the field adopts a trade dress confusingly similar to that of a established merchant, even innocently, or by chance, once the similarity is brought to his attention a failure or refusal to alter the trade dress to avoid the confusion is equivalent to an original and actual intention.") Just as the existence of such intent gives rise to an inference of secondary meaning, so may

---

**3.** This source-identification may be the same irrespective of the fact that the New Goodtime Gang were not bears. Indeed, defendants' new line may be even more likely to be associated with plaintiffs, since it may well be viewed as an extension of the Care Bear line, and name differences accordingly noticed less. *See infra* at n. 4, citing *Harlequin Enterprises Ltd. v. Gulf & Western Corp.,* 644 F.2d 946, 949 (2d Cir. 1981).

it imply a likelihood of confusion. *See, e.g., Purolator, Inc. v. EFRA Distributor's, Inc.,* 687 F.2d 554, 561 (1st Cir.1982) (citing cases); *Estate of Presley, supra,* 513 F.Supp. at 1368 (citing cases). *See generally* 2 McCarthy, *supra,* § 23:34(B), at 151–54. Moreover, many of the other factors are easily satisfied, in that plaintiffs and defendants obviously produce competing goods, of similar function and aimed at similar targets. *See generally Caesar's World, supra,* 490 F.Supp. at 824 (last four *Scott Paper* factors are more relevant in non-competing goods cases).

The court is thus left to evaluate the first, third, fourth and sixth factors in the *Scott Paper* equation. The first is, far and away, most important in the eyes of the court. Having examined the many exhibits submitted by the parties, and notwithstanding the differences between members of the Goodtime Gang and Care Bears to which defendants point, *see supra* at 1214–1215, the court finds that the overall appearance of the two lines of products is similar: in shape, color, size, packaging, graphic symbols used and manner of their use, the Care Bears and Goodtime Gang share too much not to be considered likely to confuse the public. *See generally* 2 McCarthy, *supra* § 23:7, at 63 ("Similarity between marks is really nothing more than a subjective 'eyeball' test.... Obviously, for picture and design marks (as opposed to word marks), similarity of appearance is controlling.") (footnotes omitted). In so finding, the court looks not, as defendants would have it do, to particular, individual details that might be apparent from a side-by-side inspection, but rather to "overall physical appearance." *Ciba-Geigy, supra,* 747 F.2d at 851. *See, e.g., E. Remy Martin & Co., S.A. v. Shaw-Ross International Imports, Inc.,* 756 F.2d 1525, 1531 (11th Cir.1985); *C.L.A.S.S. Promotions v. D.S. Magazines, Inc.,* 753 F.2d 14, 18 (2d Cir. 1985). Such inspection leads the court to find that, on balance, there is a likelihood of confusion between the parties' products. Nor is this finding altered by the fact that, as it appears, defendants' product costs somewhat less than does plaintiffs', partic-

ularly in that they are sold at similar types of stores, such as K–Mart. Indeed, there was no evidence offered to the effect that, as a result of such price differential, different customers sought the two products.

It only remains to examine the evidence of actual confusion between the parties' products. Of course, actual confusion need not be shown to justify relief under the Lanham Act. *See, e.g., Estate of Presley, supra,* 513 F.Supp. at 1372–73, citing *Great Atlantic & Pacific Tea Co. v. A & P Trucking Co.,* 51 N.J.Super. 412, 420 (App. Div.1958), *modified and remanded,* 29 N.J. 455, 459, 149 A.2d 595 (1959); *Perfectform Corp. v. Perfect Brassiere Co.,* 256 F.2d 736, 741–42 (3d Cir.1958); *Caesar's World, supra,* 490 F.Supp. at 823; *Fotomat Corp. v. Photo Drive-Thru, Inc.,* 425 F.Supp. 693, 708–09 (D.N.J.1977). *See generally* 2 McCarthy, *supra,* § 23:2(A), at 50–51. On the other hand, evidence of actual confusion is powerful, though not dispositive, evidence of the likelihood of confusion. *Id.,* § 23:2(B), at 51–54.

Here, there can be no evidence that consumers in the actual marketplace have been confused by defendants' products, since the marketing of such products has, for the most part, been enjoined. The parties thus rest their cases for the proposition that confusion will actually exist on survey research conducted by each. As noted, *supra,* at 1216, the court accords no weight to defendants' surveys, which tested participants' ability to read more than their ability to differentiate products in an actual buying situation, when, for example, the products might not necessarily have been side-by-side. *See, e.g., American Footwear Corp. v. General Footwear Co.,* 609 F.2d 655, 661 n. 4 (2d Cir.1979), *cert. denied,* 445 U.S. 951, 100 S.Ct. 1601, 63 L.Ed.2d 787 (1980), citing *American Luggage Works, Inc. v. United States Trunk Co.,* 158 F.Supp. 50, 53 (D.Mass.1957), *aff'd,* 259 F.2d 69 (1st Cir. 1958). Nor did such surveys ask the proper questions concerning whether or not consumers believed defendants' products to

be manufactured by plaintiffs, the appropriate question regarding secondary meaning. *See Union Carbide Corp., supra,* 531 F.2d at 385–88, *cited in* 2 McCarthy, *supra,* § 32:50, at 778–79.[4] Plaintiffs' survey, while suffering from having been designed by counsel, *see Boehringer Ingelheim, supra,* 532 F.Supp. at 1057–58, citing *Pittsburgh Press Club v. United States,* 579 F.2d 751, 758 (3d Cir.1978) ("... the survey must be conducted independently of the attorneys involved in the litigation."), and from the undisputed facts that its questions were biased, that the survey was performed in a haphazard and unprofessional manner and that the respondents were not randomly selected, is entitled to some limited weight. *See generally United States v. 88 Cases, More or Less, Containing Bireley's Orange Beverage,* 187 F.2d 967, 974 (3d Cir.), *cert. denied,* 342 U.S. 861, 72 S.Ct. 88, 96 L.Ed. 647 (1951) (the technical adequacy of surveys is a matter of weight, not admissibility). *See also Jellibeans, Inc. v. Skating Clubs of Georgia, Inc.,* 716 F.2d 833, 844–45 (11th Cir.1983), citing *C.A. May Marine Supply Co. v. Brunswick Co.,* 649 F.2d 1049, 1055 n. 10 (5th Cir.1981); *Exxon Corp. v. Texas Motor Exchange,* 628 F.2d 500, 507 (5th Cir.1980); *Amstar Corp. v. Domino's Pizza,* 615 F.2d 252, 264 (5th Cir.), *cert. denied,* 449 U.S. 899, 101 S.Ct. 268, 66 L.Ed.2d 129 (1980); *Holiday Inns, Inc. v. Holiday Out,* 481 F.2d 445, 447 (5th Cir. 1973). Those surveys show, generally, that people "in a buying mood," *see* 2 McCarthy, *supra,* § 32:48, at 771 (recommending that surveys be performed in stores or, as here, shopping malls) (citing cases) associate defendants' products in some way with plaintiffs'. The 42 percent of the people who mentioned Care Bears when confront-

ed with the Goodtime Gang would, given a technically acceptable survey, be sufficient to show a likelihood of confusion. *See generally* 2 McCarthy, *supra,* § 32:54(A)(1)–(2), at 783–85, citing, *e.g., Exxon Corp. v. Texas Motor Exchange, supra,* 628 F.2d at 507 (15% or 23% give rise to likelihood of confusion); *Helene Curtis Industries, Inc. v. Church & Dwight Co., Inc.,* 560 F.2d 1325, 1331 (7th Cir.1977) (290 out of 998, or 29%), *cert. denied,* 434 U.S. 1070, 98 S.Ct. 1252, 55 L.Ed.2d 772 (1978); *Humble Oil & Refining Co. v. American Oil Co.,* 405 F.2d 803, 817 (8th Cir.) (11% to 49%), *cert. denied,* 395 U.S. 905, 89 S.Ct. 1745, 23 L.Ed.2d 218 (1969); *National Football League v. Governor of the State of Delaware,* 435 F.Supp. 1372, 1381 (D.Del.1977) (19% or 21%); *Grotrian, Helfferich Schultz Th. Steinweg Nachf v. Steinway & Sons,* 365 F.Supp. 707, 716 (S.D.N.Y.1973) *aff'd in pertinent part,* 523 F.2d 1331 (2d Cir. 1975). Though such results might not alone give rise to a finding of likelihood of confusion, because of the defects in plaintiffs' survey, they corroborate the court's own finding thereof, and are probative to that extent, at least. *See generally* 2 McCarthy, *supra,* § 32:54, at 784 ("In many cases finding likely confusion, the court's opinion carefully recites that the survey evidence is merely supportive of the court's independent conclusion reached on the foundation of all the evidence introduced.").

In sum, the court finds that defendants' products, both bears and other species, are likely to be confused with plaintiffs' pre-existing Care Bear products. Such factual finding, based upon the aforestated legal conclusions, completes the court's analysis

---

**4.** Based in part upon their survey, defendants argue that the average customer would be able to differentiate plaintiffs' and defendants' products by means of the labeling of the two. While this is a factor to be considered, *see, e.g., American Rolex Watch Corp. v. Ricoh Time Corp.,* 491 F.2d 877, 879 (2d Cir.1974); *General Radio Co. v. Superior Electric Co.,* 321 F.2d 857, 864 (3d Cir.1963); *Sylvania Electric Products v. Dura Electric Lamp Co.,* 247 F.2d 730, 734 (3d Cir. 1957), the court does not here find it to be

controlling in light of the overall similarity of appearance, and the lack of evidence that consumers would take sufficient care in purchasing a stuffed animal to notice the difference. *See generally* 2 McCarthy, *supra,* § 23:15(B), at 82–83 ("... a junior user cannot justify its use of another's mark simply by taking on its own trade-name.") (citing cases). *See, e.g., Harlequin Enterprises Ltd. v. Gulf & Western Corp.,* 644 F.2d 946, 949 (2d Cir.1981).

of plaintiffs' Lanham Act claim. Having found such claim to be made out, it now remains only to determine what relief, if any, is to be granted.

### D. *Relief*

#### 1. *Contempt*

Plaintiffs' application for contempt is based, essentially, on three grounds. First, plaintiffs contend that defendants marketed the New Goodtime Gang, including a raccoon, a monkey, two styles of dog and a mouse, but no teddy bears, after entry of the court's November 29, 1983 preliminary injunction, although they had decided to do so prior to that time. Second, plaintiffs argue that defendants continued to ship the New Goodtime Gang, even after entry of a September 14, 1984 Consent Order prohibiting them from doing so. And third, plaintiffs seek a contempt citation for defendants' marketing of the so-called K11 assortment of bears and dogs for Easter, in putative violation of both Orders.

■ As to the first, defendants admit having marketed the non-bear animals in question not only despite, but, indeed, as a result of, the November 29, 1983 preliminary injunction. The court finds, however, that the fall, 1983 litigation was directed solely to stuffed bears, and it interprets its Orders enjoining the marketing and sale of defendants' products as applicable to bears only. To hold defendants in contempt of this Order for non-bear sales would be to grant plaintiffs' application to modify and extend the Order at issue *nunc pro tunc*. Such a holding would run afoul of the fundamental rule that "[p]ersons may not be placed at risk of contempt unless they have been given specific notice of the norm to which they must pattern their conduct." *Inmates of Allegheny County Jail v. Wecht*, 754 F.2d 120, 129 (3d Cir.1985), citing *Granny Goose Foods, Inc. v. Local 70, International Brotherhood of Teamsters*, 415 U.S. 423, 444, 94 S.Ct. 1113, 1126, 39 L.Ed.2d 435 (1974); *Schmidt v. Lessard*, 414 U.S. 473, 476, 94 S.Ct. 713, 715, 38 L.Ed.2d 661 (1974); *Gunn v. University Committee to End the War in Viet Nam*, 399 U.S. 383, 388–89, 90 S.Ct. 2013, 2016–17, 26 L.Ed.2d 684 (1970). *See also* Fed.R. Civ.P. 65(d), *cited in Ideal Toy, supra*, 685 F.2d at 83. Defendants were not, by the November 7 and 29, 1983 Orders, placed on notice that they were prohibited from marketing non-bear products. They cannot, therefore, be held in contempt of those Orders for their activities with respect to the New Goodtime Gang assortment.[5]

■ Second, plaintiffs urge that defendants violated the terms of the parties' September 14, 1983 Order by shipping goods covered by the terms of such Order. However, the court finds that plaintiffs have not borne their burden of proving by clear and convincing evidence that any shipments left defendants' factory after the September 5, 1984 cut-off date. *See, e.g., In re Jacques*, 761 F.2d 302, 306 (6th Cir.1985) (citing cases); *United States v. Huebner*, 752 F.2d 1235, 1241 (7th Cir. 1985); *Newman v. Graddick*, 740 F.2d 1513, 1528 (11th Cir.1984); *In re Arthur Treacher's Franchisee Litigation*, 689 F.2d 1150, 1156–57 (3d Cir.1982), citing *Schauffler v. Local 1291, International Longshoremen's Association*, 292 F.2d 182, 189 (3d Cir.1961). Therefore, it cannot hold defendants in contempt for these actions.

■ Finally, defendants' marketing of the K11 bears and dogs, which were unboxed 7-inch dogs and bears having an embroidered flower on their tummies, and designed for Easter, is also alleged to be in violation of both the November, 1983 and September, 1984 Orders of the court. As discussed, *supra*, at 1225, the dogs

---

**5.** Nor are their admitted sales of infringing bears between November 7, 1983 and November 29, 1983 contemptible where such sales ceased, and defendants purged themselves of contempt of the temporary restraining order of the court, well before the filing of the instant motion. *See generally McDonald's Corp. v. Victory Investments*, 727 F.2d 82, 87 (3d Cir.1984) (civil contempt is designed to coerce compliance with an order, and can only give rise to retrospective relief upon a showing of actual loss by complainant, not alleged or proved here).

are not covered by the November, 1983 Order of the court, and cannot be the basis of contempt of such Order. Beyond this, however, the court finds no basis for defendants' actions in marketing these products. The November, 1983 Order enjoins defendants

> from directly or indirectly manufacturing, reproducing, making, printing, reprinting, publishing, displaying, importing, selling, offering for sale, promoting, shipping, delivering, advertising or distributing plush material stuffed toy teddy bears, such as those appended hereto as Exhibit A, having a body and head of a pastel color, with a generally white chest and stomach region, of 6–24″ in height, having an applied decoration on the chest and/or stomach in the form of a graphic design consisting of one or more of a rainbow, a moon, a cloud, *a flower*, a sun, a birthday cake, a heart, a clover or other graphic designs likely to be confused therewith as a result of size, shape, color and/or subject matter, or which is packaged in a blue single unit package having artwork depicting the aforesaid bears and/or graphic designs.

Defendants now argue that the K11 bears (P–107B and P–107D) are not "such as those appended hereto as Exhibit A." This contention is without merit: the K11 bears fall squarely within the description contained in the November, 1983 preliminary injunction Order. They are 7″ tall, of a pastel color, with a flower tummy graphic; as such, their marketing was clearly enjoined. Similarly, defendants' contention that the K11 dogs (P–107A and P–107C) fall outside the September 14, 1984 Order is without merit. That Order does not allow defendants to "take any steps to deliver or cause to be delivered ... any of the merchandise which is the subject of plaintiffs' motion, including but not limited to [the New Goodtime Gang]." The New

Goodtime Gang, in turn, included a 7″ dog with a similar tummy graphic; defendants' K11 dog is, in all material respects, identical to the dog pictured in the Exhibit to the September, 1984 Order and thus falls within the literal purview of such Order.

■ For these two acts, then, the court finds defendants in contempt of court.[6] Counsel are urged to meet and to attempt to arrive at an amount that will compensate plaintiffs for their commercial losses incurred as a result of such contempt, and for the attorneys' fees and costs directly attributable to defendants' K11 products alone. Should counsel not be able to agree on such amount, the appropriate application should be made to the court.

### 2. *Injunction*

Defendants here move to vacate the preliminary injunction in effect, and plaintiffs to extend such injunction to stuffed animals other than teddy bears which might also be confused with plaintiffs' products, and associated by consumers with plaintiffs. Having found plaintiffs successful on their Lanham Act claim, in proving the nonfunctionality of their products' overall appearance, as well as secondary meaning and, especially, likelihood of confusion, the first prong of the test for preliminary injunctive relief continues to be met. *See generally SI Handling Systems, Inc. v. Heisley*, 753 F.2d 1244, 1254 (3d Cir.1985), citing *Klitzman, Klitzman and Gallagher v. Krut*, 744 F.2d 955, 958–59 (3d Cir.1984); *Continental Group v. Amoco Chemicals Corp.*, 614 F.2d 351, 356–57 (3d Cir.1980). Defendants, however, contend that plaintiffs fail to justify injunctive relief, for three reasons: first, defendants contend that, far from experiencing irreparable harm as a result of defendants' acts in marketing the New Goodtime Gang, plaintiffs have experienced enormous success during the last few years. Second, defend-

---

**6.** Of course, defendants were required to obey these Orders pending their challenge to them. *See, e.g., Walker v. City of Birmingham,* 388 U.S. 307, 313–14, 87 S.Ct. 1824, 1828, 18 L.Ed.2d 1210 (1967). Furthermore, the fact that the court now finds tummy graphics to be functional, and thus not properly a part of the prior injunctions, does not justify defendants' actions in producing products otherwise within the *scope of such Orders,* and confusingly similar to plaintiffs' products.

ants assert plaintiffs' failure to point to even a single instance of actual confusion in the marketplace. And third, defendants argue that plaintiffs' claim of irreparable harm is belied by their lengthy period of inaction, after discovering the existence of the New Goodtime Gang, but prior to bringing the instant motion.

The court disagrees with each of defendants' arguments as to irreparable harm, and finds injunctive relief to continue to be appropriate. First, the court adheres to its legal position, stated earlier, that irreparable harm should be presumed from a showing of likelihood of confusion. *See, e.g., Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1254 (3d Cir.1983) (copyright infringement), *cert. dismissed*, 464 U.S. 1033, 104 S.Ct. 690, 79 L.Ed.2d 158 (1984), *cited in American Greetings Corp. v. Dan-Dee Imports, Inc.*, *supra*, Bench Op. at 9. *See also Guinness & Sons, P.L.C. v. Sterling Publishing Co., Inc.*, 732 F.2d 1095, 1099 (2d Cir.1984) (dictum), citing *Warner Brothers, Inc. v. Gay Toys, Inc.*, 658 F.2d 76 (2d Cir.1981); *Processed Plastic Co. v. Warner Communications, Inc.*, 675 F.2d 852, 858 (7th Cir.1982) ("This and many other Courts have often recognized that the damages occasioned by trademark infringement are by their very nature irreparable and not susceptible of adequate measurement for remedy at law.") (citing authorities); *Matter of Vuitton et Fils, S.A.*, 606 F.2d 1, 4 (2d Cir.1979) (citing cases). *See generally* 2 McCarthy, *supra*, § 30:18, at 488–90. The fact that plaintiffs have thus far attained commercial success notwithstanding defendants' temporary marketing of the New Goodtime Gang cannot bar the injunctive relief sought: irreparable harm here results from the difficulty of computing lost sales, the damage to plaintiffs' reputation in the event that defendants' products are of inferior quality to plaintiffs, and, generally, plaintiffs' lack of control over what the public likely perceives to be plaintiffs'

goods. Plaintiffs' commercial success, in the interim, does not render damages any easier of computation or lessen the loss of reputation that plaintiffs will suffer should consumers buy defendants' confusingly similar goods, believing them to be plaintiffs'. Nor, finally, is the lack of evidence of actual confusion of consequence: as noted, *supra*, at 1223, actual confusion need not be shown in order to prevail on the merits of plaintiffs' Lanham Act claim. Neither is it necessary to demonstrate actual confusion in order to prove irreparable harm. *See, e.g., Paco Rabanne Parfums, S.A. v. Norco Enterprises, Inc.*, 680 F.2d 891, 894 (2d Cir.1982) (citing cases); *Warner Brothers, Inc. v. Gay Toys, Inc.*, *supra*, 658 F.2d at 79. The court's finding that plaintiffs' and defendants' products are likely to be confused creates, at least, a *prima facie* case of irreparable injury; in response, defendants have submitted no credible evidence to the effect that such confusion does not occur.

Finally, the court also does not find plaintiffs to have acted with insufficient dispatch to negative their claim of irreparable harm;[7] indeed, the court finds that, throughout this litigation, plaintiffs have defended their rights aggressively and proceeded expeditiously, in light of their knowledge at any particular point in time. In any event, as recently stated by the Court of Appeals for the Third Circuit, "The relevant inquiry is whether the movant is in danger of suffering irreparable harm at the time the preliminary injunction is to be issued." *SI Handling Systems*, *supra*, 753 F.2d at 1264. The court finds that plaintiffs are in such danger, and considers injunctive relief accordingly necessary. In so ruling, the court also seeks to continue to protect the public interest which underlies the Lanham Act; children, and their parents, have a right to be sure that, when they want a Care Bear, and believe they have bought a Care Bear prod-

---

**7.** Defendants have abandoned any laches claim they might have. *See* Proposed Findings of Fact and Conclusions of Law at D.96–97.

uct, that is what has been purchased. *See SK & F, supra,* 625 F.2d at 1067.

 For all of these reasons, the court hereby denies defendants' application to vacate the injunction now in effect and grants plaintiffs' application to extend such injunction to products other than bears. However, the court also finds that the tummy graphics on plaintiffs' products are functional, and that defendants are not, therefore, barred from utilizing tummy graphics on their products. Because the parties have focused their arguments almost exclusively on the propriety of defendants' use of tummy graphics, and not addressed the other features of plaintiffs' line, the court is unable to formulate an order embodying its directive that defendants' products not be confusingly similar to plaintiffs. It hereby directs that the parties meet and attempt to agree to the form of such an order, specifying those features which defendants may and may not utilize on their products, in order to allow them to compete with plaintiffs, without copying plaintiffs' products. In the event that the parties cannot agree, the points of disagreement and positions of the parties should be succinctly summarized for the court, which will resolve the form of order. To the extent that the differences between the parties is a matter of visual appearance, the court recommends that a neutral party be chosen to serve as a Special Master to resolve disputes regarding appearance now and in the future.

Plaintiffs are directed to submit an appropriate interim order, embodying the substance of this Opinion, and consented to as to form.