**HARTFORD HOUSE LTD., et al., Plaintiffs,**

v.

**HALLMARK CARDS INCORPORATED, et al., Defendants.**

Civ. A. No. 86–C–1458.

United States District Court, D. Colorado.

Nov. 20, 1986.

Harry G. Helkonian, Ronald Redcay, Los Angeles, Cal., Steven Briggs, Hutchinson, Black Hill & Cook, Boulder, Colo., for plaintiffs.

Andrea I. Williams, Andrew M. Low, Raymond P. Moore, Denver, Colo., for defendants.

## ORDER

CARRIGAN, District Judge.

This is an action for alleged trade dress infringement commenced by the plaintiffs Susan Polis Schutz, Stephen Schutz, and Hartford House Ltd. doing business as Blue Mountain Arts ("Blue Mountain"), against the defendants Hallmark Cards Incorporated and Hallmark Marketing Corporation (hereafter collectively referred to as "Hallmark"). Plaintiffs allege that Hallmark designed and distributed for sale a line of greeting cards that are deceptively and confusingly similar to greeting cards manufactured and sold by the plaintiffs. Plaintiffs assert that the defendants have violated the Lanham Act Section 43(a), 15 U.S.C. § 1125(a), and are guilty of unfair competition and copyright infringement.

On October 24, 1986, an all day hearing was held on the plaintiffs' Motion for a Preliminary Injunction seeking to enjoin the defendants from marketing their Hallmark "Personal Touch" greeting card line on the ground that it consists of unauthorized copies of the plaintiffs' "Airebrush Feelings" and "Watercolor Feelings" lines of cards.

After studying the parties' voluminous briefs, I heard over six hours of testimony and argument on whether the plaintiffs are entitled to an injunction under the Lanham Act or Colorado unfair competition law, or both, to halt Hallmark's manufacturing and marketing of the allegedly infringing

cards. In their preliminary injunction motion, the plaintiffs did not rely on their claims of copyright infringement and this order does not address those matters. This memorandum constitutes my preliminary findings of fact and conclusions of law as required by Rule 52(a), Fed.R.Civ.P. Obviously the findings and conclusions may be different after a trial on the merits.

Plaintiffs design, manufacture and sell greeting cards. Stephen Schutz and Susan Polis Schutz, the principals of Blue Mountain, began their business by selling posters from the back of a pickup truck while traveling across country. Susan composed poetry for the posters and Stephen created the background artwork.

In the mid–1970's, the Schutzes began producing greeting cards. Currently, their major card lines are "Airebrush Feelings" and "Watercolor Feelings." These lines have been on the market since 1981 and 1983, respectively. Blue Mountain has sold approximately 100 million cards and five million books of collected poetry.

Defendant Hallmark has produced greeting cards for more than seventy-five years. In June 1977, it began to manufacture and sell its Personal Touch line of greeting cards. Personal Touch cards on the market prior to April 1, 1986 are referred to as "first generation" Personal Touch.[1]

Blue Mountain has been an enormously successful leader in the phase of the greeting card industry aimed at expressing very personal, strong emotions, and it has been said that Susan Polis Schutz is the "reigning star"[2] in this aspect of the greeting card business. Plaintiffs' commercial success did not go unnoticed by Hallmark, especially after Hallmark's first generation Personal Touch line failed to perform up to expectations in competition with Blue Mountain's cards.

According to an internal Hallmark document entitled "Personal Touch Creative Plan Outline," Blue Mountain was viewed by Hallmark as a serious competitive threat:

"Personal Touch was created with the intent of 'displacing Blue Mountain.' A growing number of competitive cards have been filtering their way into Hallmark channels. Blue Mountain Art is frequently cited as one of the strongest competitive threats in terms of channel penetration."

Conversely, the Hallmark first generation Personal Touch cards posed little threat to Blue Mountain according to another Hallmark memorandum entitled "Executive Summary—Personal Touch vs. Blue Mountain Art Retail Test":

"Blue Mountain Art cards have a higher performance level than Personal Touch possibly due to:

—a greater awareness of the BMA design styling and brand name recognition."

In early 1986, Hallmark mounted an intense effort to capture the emotionally expressive non-occasion greeting card market. It conducted extensive research of the respective retail performance levels and strengths of the Personal Touch and Blue Mountain card lines. At one point, Hallmark even convened a panel of card dealers to suggest ways of improving its market position. A Hallmark internal memorandum summarizing the panel's recommendations concluded:

"The retailers think that Hallmark missed the mark on their attempt at alternative greeting cards. They think some of the offerings are good, but they will not displace Blue Mountain.... Hallmark should copy the alternative greeting cards offered by competitors.... Hallmark can either steal ideas

---

**1.** Hallmark's Personal Touch cards, like the plaintiffs' Airebrush Feelings and Watercolor Feelings, are cards intended to express strong emotions. "[C]ards retailing love, heartache and other real-life, prepackaged emotions are among the hottest products in the industry."

*Selling Strong Emotions: A Card for Every Feeling, From Insecurity to Heartache,* Time Magazine, May 12, 1986, at 95.

**2.** *Id.*

from the other alternative greeting card companies or be innovative."

Hallmark did not choose the latter; it chose to imitate instead of innovate.

On April 1, 1986, Hallmark introduced as replacements for much of its Personal Touch line a series of cards now commonly referred to as the "second generation" Personal Touch cards. Plaintiffs claim that these "second generation" cards infringe on their trade dress protected under the Lanham Act.

### A. The Lanham Act.

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), provides in relevant part as follows:

"Any person who shall affix, apply, or annex, or use in connection with any goods or services or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce ... shall be liable to a civil action ... by any person who believes that he is or is likely to be damaged by use of any such false description or representation."

 Section 43(a) creates a federal cause of action for trade dress infringement. *John F. Harland Co. v. Clarke Checks Inc.,* 711 F.2d 966, 980 (11th Cir.1983). Product design may constitute protectable trade dress under § 43(a):

"Courts have long recognized that recovery under § 43(a) is not restricted to federally registered trademarks, but extends to "words, symbols, collections of colors and designs, or advertising materials or techniques" that the purchasing public has come to associate with a single source. *RJR Foods, Inc. v. White Rock Corp.,* 603 F.2d 1058, 1059 (2d Cir.1979). *See also Perfect Fit Industries, Inc. v. Acme Quilting Co.,* 618 F.2d 950 (2d Cir.1980); J.T. McCarthy, Trademarks and Unfair Competition § 15.3 (1973)." *Harlequin Enterprises Ltd. v. Gulf & Western Corp.,* 503 F.Supp. 647, 649 (S.D.N.Y.1980).

 To prevail on a trade dress infringement claim under § 43(a), a plaintiff must prove three basic elements:

1) That the features of the trade dress are primarily non-functional;

2) That the trade dress has secondary meaning; and,

3) That the competing products' respective trade dresses are confusingly similar, thus giving rise to a likelihood of confusion among consumers as to their sources. *Black & Decker Mfg. Co. v. Ever-Ready Appliance Mfg. Co.,* 518 F.Supp. 607, 616 (E.D.Mo.1981).

#### 1. Functionality.

 A functional feature is one that "is essential to the use or purpose of the article or that affects the cost or quality of the article." *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.,* 456 U.S. 844, 850–51 n. 10, 102 S.Ct. 2182, 2187 n. 10, 72 L.Ed.2d 606 (1982), citing *Sears, Roebuck & Co. v. Stiffel Co.,* 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964); *Kellogg Co. v. National Biscuit Co.,* 305 U.S. 111, 59 S.Ct. 109, 83 L.Ed. 73 (1938). An essential or utilitarian product feature must remain in the public domain to foster the policies of competition and product improvement. If the feature is non-essential, however, and serves to identify the source of the goods, it is protectable trade dress. *United States Golf Association v. St. Andrews Systems, Data-Max, Inc.,* 749 F.2d 1028 (3d Cir.1984).

 This comparative analysis of utilitarianism versus source identification requires a balancing of sometimes conflicting social interests. Functional features are not legally protected methods of identification, regardless of their association with the manufacturer, because their usefulness in identifying the product's source is outweighed by the public's interest in product refinement and development. That public interest in product improvement is served by granting competitors free access to a product's functional features. *Id.*

■ The only product features which should be classified as functional, therefore, are those utilitarian aspects which are essential to the product's use. *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 850–51 n. 10, 102 S.Ct. 2182, 2187 n. 10, 72 L.Ed.2d 606 (1982). Competitive necessities that embody superior designs for the product's use are functional, particularly if only a limited number of superior designs are available. *In re Morton-Norwich Products, Inc.*, 671 F.2d 1332 (Cust. & Pat.App.1982).

■ An exception to the right to copy exists, however, when it is demonstrated that alternative designs are available, the product can serve its purpose without incorporating the feature in question, and the feature or features are established symbols of source identification. *Id.* at 1337–38. Competition must occasionally defer to the policy protecting non-essential design originality.

No mechanical test exists to assess a feature's functionality. Instead, I must balance the divergent social interests of competition and source identification by determining whether a product's value and use are dependent on an essential feature, or whether the feature's primary value is in identifying its provider. *United States Golf Association v. St. Andrews Systems, Data-Max, Inc.*, 749 F.2d 1028, 1034 (3d Cir.1984).

This inquiry is focused on the design features of emotionally expressive non-occasion greeting cards:

[A] discussion of "functionality" is always in reference to the design of the thing under consideration (in the sense of its appearance) and not the thing itself. One court, for example, paraphrasing Gertrude Stein, commented that "a dish is a dish is a dish." *Hygenic Specialties Co. v. H.G. Salzman, Inc.*, 302 F.2d 614, 621, 133 USPQ 96, 103 (2d Cir.1962). "No doubt, by definition, a dish always functions as a dish and has its utility, but it is the appearance of the dish which is important in a case such as this, as will become clear." *In re Morton-Norwich*

*Products, Inc.*, 671 F.2d 1332, 1337–38 (Cust. & Pat.App.1982).

Hallmark relies on the "card is a card is a card" reasoning. A greeting card, however, may functionally convey a message and yet simultaneously communicate through inherently distinctive non-essential features identifying the product's source. In *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 203–04 (2d Cir.1979) the Second Circuit dealt with a similar problem. Plaintiff sought to preliminarily enjoin exhibition of the motion picture "Debbie Does Dallas", a graphic depiction of a "Texas Cowgirl's" sexual escapades. During the apparently few scenes in the film where "Debbie" appeared clothed, she wore a cheerleading uniform that the plaintiff claimed was subject to its trademark.

The Second Circuit held that the combination of white boots, white shorts, blue blouse and white star-studded vest and belt was an arbitrary design which made an otherwise functional cheerleading uniform trademarkable. *Id.* at 204. Although a trademark could not be claimed in all clothing designed and fitted to allow free movement while performing cheerleading routines, the court concluded that legally protected trade dress existed in the combination of colors and decorations that distinguished the Dallas Cowboys' cheerleader uniform from other cheerleading uniforms. *Id.*

■ Similarly, the arbitrary selection and combination of greeting card features may constitute protected trade dress even though the features serve useful purposes in conveying messages and invoking certain emotions and feelings. Decorative or stylistic non-essential greeting card features may serve these functions, yet at the same time identify their source.

Moreover, the sponsorship or origin of the product can be anonymous as long as it is recognizable. In *Beer Nuts, Inc. v. Clover Club Foods Co.*, 711 F.2d 934, 939 (10th Cir.1983), the court stated: "Trademark strength is measured by its tendency to

identify the goods sold under the mark as emanating from a particular source, although possibly anonymous source." The Airebrush and Watercolor Feelings cards have an inherently distinctive and highly uniform "look" that is recognizable and attributable to Blue Mountain. The following elements comprise that look or trade dress:

1. A two-fold card containing poetry on the first page and the third page.
2. Unprinted surfaces on the inside three panels.
3. A deckle edge on the right-side of the first page.
4. A rough edge stripe of color, or wide stripe, on the outside of the deckle edge of the first page.
5. A high quality, uncoated and textured art paper for the cards.
6. Florescent ink for some of the colors printed on the cards.
7. Lengthy poetry, written in free verse, typically with a personal message.
8. Appearance of hand-lettered calligraphy on the first and third page with the first letter of the words often enlarged.
9. An illustration that wraps around the card and is spread over three pages, including the back of the card.
10. The look of the cards primarily characterized by backgrounds of soft colors done with air brush blends or light watercolor strokes, usually depicting simple contrasting foreground scenes superimposed in the background.

Defendants contend that the individual cards must be dissected and each feature analyzed separately for functionality. I reject that approach as alien to the policies of the Lanham Act. *See generally, LeSportsac Inc. v. K–Mart Corp.*, 754 F.2d 71, 76 (2d Cir.1984) (analyzing each individual feature of overall design as functional or nonfunctional is not the appropriate inquiry, but instead it is whether overall design of bags is functional or non-functional); *Dallas Cowboys Cheerleaders, Inc. v. Pussy-cat Cinema Ltd.*, 604 F.2d 200 (2d Cir. 1979) (overall look of costumes protected).

The creation and arrangement of individual product features into a particular overall design may itself constitute a non-functional product feature. A number of courts have adopted this aggregate approach to deciding the functionality question. *See, e.g., LeSportsac Inc. v. K–Mart Corp.*, 754 F.2d 71 (2d Cir.1984); *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema Ltd.*, 604 F.2d 200 (2d Cir.1979); *American Greetings Corp. v. Dan-Dee Imports Inc.*, 619 F.Supp. 1204 (D.N.J.1985); *Harlequin Enterprises Ltd. v. Gulf & Western Corp.*, 503 F.Supp. 647 (S.D.N.Y. 1980).

In *American Greetings Corp. v. Dan-Dee Imports, Inc.*, 619 F.Supp. 1204 (D.N. J.1985), the plaintiff had designed a line of stuffed toys known as Care Bears. These were composed of various individual elements including "jowly" heads, heart shaped paw pads and noses, pastel colors, "tummy graphics," and "tushie tags." The court concluded that each of these elements, standing alone and apart, was functional but in combination they were nonfunctional:

"The court thus concludes that tummy graphics on white backgrounds are functional, and that plaintiffs may not acquire monopoly protection of them from the Lanham Act. However, the Act does proscribe defendants' copying of plaintiffs' product in full: defendants' products could and should have been designed to minimize confusion with plaintiffs' products, by altering non-functional elements of their stuffed animals, or combining functional elements in a different manner." *Id.* at 1220.

Similarly, in *Harlequin Enterprises Ltd. v. Gulf & Western Corp.*, 503 F.Supp. 647 (S.D.N.Y.1980), the plaintiff had created a fictional romance novel collection consisting of 372 individual titles. Each novel was identified to the series as a whole by the bookcover's distinctive "look" repeated throughout the series. That look consisted of various features of lettering, graphic

lines, the name "Harlequin Presents" and "a circular colored montage against a background of scenes depicting the story line." *Id.* at 649. Defendant's romance series utilized a similar format except that it bore the title "Silhouette Romance." The court held that the aggregate features of the Harlequin book covers constituted trade dress protected under § 43(a).

■ Paper, verse and ink are functional features of a greeting card. The design and amalgamation of those features in a uniform fashion with other features, however, has produced the non-functional Blue Mountain "look".

Further evidence that the features developed by the plaintiffs are non-functional are the infinite alternative designs available to the defendants. Introduced into evidence were cards of the "highly emotional non-occasion" genre, manufactured by Hallmark and the plaintiffs' other competitors, with varying features quite different from the plaintiffs' trade dress. This is not a case where there are a limited number of designs available, thus mandating a finding of functionality. *Cf. Keene Corp. v. Paraflex Indus., Inc.,* 653 F.2d 822 (3d Cir.1981).

■ The testimony clearly revealed that it would not be difficult for Hallmark to devise distinguishing features for its second generation Personal Touch line. Hallmark tested five different potential "looks" for the second generation line. By choosing a look so similar to Blue Mountain's that it is nearly impossible to differentiate between the respective card lines, the defendants have violated the core purpose of the Lanham Act to prevent the newcomer or "free rider" from unfairly capitalizing on another's innovation and development. *Sicilia Di R. Biebow & Co. v. Cox,* 732 F.2d 417 (5th Cir.1984).

The ultimate inquiry concerning functionality is whether characterizing a feature or configuration as protected under § 43(a) of the Lanham Act "will hinder competition or impinge on the right of others to compete in the sale of goods." *Sicilia Di R. Bie-*

*bow & Co. v. Cox,* 732 F.2d 417, 429 (5th Cir.1984). *See also, Truck Equipment Service Co. v. Fruehauf Corp.,* 536 F.2d 1210 (8th Cir.1976); *Fotomat Corp. v. Cochran,* 437 F.Supp. 1231 (D.Kan.1977). The availability of alternative designs is a key factor in this regard. As stated *In re Morton-Norwich Products, Inc.,* 671 F.2d 1332 (Cust. & Pat.App.1982), "Since the effect upon competition 'is really the crux of the matter,' it is of course significant that there are other alternatives available."

Jeffrey Willsey, a Hallmark and Blue Mountain competitor, whose testimony I found to be quite credible, indicated that there is room for innovation and profit in the emotional non-occasion greeting card market without duplicating or copying another's products.

One salutary purpose of the Lanham Act in this context is to protect a creative artists' rights in his or her creation and thus provide incentive to be creative. By protecting and fostering creativity, a product with features different and perhaps preferable to the Blue Mountain product may well be developed. Offering consumers a choice in the non-occasion greeting card market stimulates, rather than stifles competition.

Clearly, many design alternatives are available. There is no necessity to simulate Blue Mountain's trade dress.

> "Allowing the plaintiffs to exclude others from using their trade dress will not hinder competition nor will it interfere with the rights of others to compete.... In fact others are competing without copying, and they have not found it necessary to simulate the plaintiffs' trade dress in order to survive and prosper." *Cf. In re Morton-Norwich Products, Inc., supra* at 1332.

A design feature is essential only if the feature is dictated by the functions to be performed. *Warner Bros., Inc. v. Gay Toys, Inc.,* 724 F.2d 327, 331 (2d Cir.1983); *In re Morton-Norwich Products, Inc.,* 671 F.2d 1332, 1342 (Cust. & Pat.App.1982). The fact that the Airebrush and Watercolor Feelings cards are useful and perform their

intended functions effectively is not sufficient to render the design of the cards functional. *Id.* An emotional non-occasion greeting card can be folded, colored, shaped, cut, edged and designed in infinite ways and still function to send its message. As observed in *Morton:*

"What is sought to be registered, however, is no single design feature or component but the overall composite design comprising both bottle and spray top. While that design must be *accommodated* to the functions performed, we see no evidence that it was *dictated* by them and resulted in a functionally or economically superior design of such a container." *Id.* at 1342.

A non-functional feature is one whose primary value is to identify the source of the particular goods or services. *United States Golf Ass'n v. St. Andrews Systems, Data-Mix, Inc.,* 749 F.2d 1028 (3d Cir.1984). Hallmark admitted in its internal memoranda that Blue Mountain's competitive strength lies in the "greater awareness of the Blue Mountain Arts design styling and brand name recognition." As more fully discussed below, the Airebrush and Watercolor Feelings cards have an inherently distinctive and recognizable look attributable to their source, Blue Mountain.

I conclude, therefore, for purposes of preliminary injunctive relief, that the Airebrush and Watercolor Feelings features are primarily non-functional.

### 2. *Secondary Meaning.*

■ In order to prevail, the plaintiffs must establish that the Airebrush and Watercolor Feelings "look" possesses a secondary meaning. To establish secondary meaning, a manufacturer must show that, in the minds of the public, the primary significance of a product's feature is to identify the product's source rather than the product itself. *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.,* 456 U.S. 844, 850–51 n. 10, 102 S.Ct. 2182, 2185 n. 10, (1982).

The distinctiveness of the trade dress largely determines the protection it will be afforded under the Lanham Act. *Beer Nuts, Inc. v. Clover Club Foods Co.,* 711 F.2d 934 (10th Cir.1983). Some courts have even gone so far as to say that if the trade dress is inherently distinctive, there is no need to prove secondary meaning. *See, e.g., Animal Fair Inc. v. Amfesco Industries, Inc.,* 620 F.Supp. 175, 190 (D.C.Minn. 1985). The better rule, however, and the rule approved by the 10th Circuit in *Beer Nuts,* is that an inherently distinctive trade dress is proof of secondary meaning.

■ Particularly probative evidence of secondary meaning are the admissions and statements of Hallmark's own employees and witnesses. Internal Hallmark memoranda introduced at the hearing included the following statements:

1. "BMA is a formidable competitor, because of their recognizable look established through 10 years of retail exposure, their high density/high visibility displays and their loyal, established base of retailers and customers."

2. "[BMA] Weaknesses
—Vulnerable to imitation—only one design/editorial style."

3. "Blue Mountain Arts is a copy intensive line characterized by conversational prose. The prose is most often quite long, although short prose can also be found in the line. The copy is always positioned on the cover of the card and is sometimes continued on the inside left or cover of infold panel. The inside (aside from these continuations) is always blank. In addition, some of the copy is titled.

Distinctive features of the copy include its warmth, as well as its association with personal subjects such as insecurity, anxiety, doubt, support, reassurance, and encouragement. The copy is always followed by the name of the author."

4. "Because of its overall consistency and 'look' across all product lines, Blue Mountain Arts is recognizable among card companies.... The calligraphed sentiments are executed with little variation in style...."

Blue Mountain has made no attempts to vary their offering through special formats or design."

It is apparent from these memoranda that Hallmark not only believed Blue Mountain cards have an inherently distinctive look, but that their look is easily recognizable and attributable to a source that has generated a loyal customer following.

Evidence of secondary meaning was elicited from Hallmark's own witness Mary Ann Scott, a professor of art at the University of Denver. I found Professor Scott's credentials and experience as an art connoisseur impressive. She testified that the plaintiffs' cards were all very uniform and consistent in design.

Professor Scott further testified that based on her expertise she could detect artistic differences between the plaintiffs' and the defendants' cards. Her capacity and talent for artistic attribution, however, are rare qualities not found often among those who buy greeting cards. Plaintiffs' market research revealed that the average consumer cannot detect differences in minute stylistic details among or between the competing card lines here involved.

Secondary meaning can also be based on a finding that there is a likelihood of consumer confusion. *Transgo Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1015 (9th Cir.1985) (cert. granted). Neither Professor Scott's testimony, nor that of any other defense witness, dissuades me from making such a finding.

Even more damaging to Hallmark, in my view, are the statements and admissions that Blue Mountain's cards have a distinctive look made at the time when Hallmark's Chief Executive Officer explored the possibility of buying Blue Mountain. As testified by Stephen Schutz and Susan Polis Schutz, without contradiction, they were contacted early in 1985 by David H. Hughes, Hallmark's Chief Executive Officer. Hughes visited them and indicated that Hallmark was interested in buying Blue Mountain or pursuing joint ventures. During the course of his visit, Hughes told the Schutzes "they were lucky" because

Blue Mountain had its own "look" and style.

■ Proof of copying may be sufficient in and of itself to establish secondary meaning because there is no reason to copy a non-functional feature except to capitalize on an already existing secondary meaning. *Ideal Toy Corp. v. Plawner Toy Mfg. Corp.*, 685 F.2d 78, 82 (3d Cir.1982); *Transgo Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1011 (9th Cir.1985) (cert. granted). Patricia Davis, Hallmark product manager, testified that after its first generation cards proved a commercial failure, she was given the responsibility to make the line successful. Under her leadership Hallmark purchased 200 of the Blue Mountain cards and began to analyze the Blue Mountain look.

At one point Hallmark even posed to a panel of card dealers the following question: "How do you feel about Hallmark copying Recycled Paper, Blue Mountain Art, and California Dreamers." Moreover, in a June 16, 1986 performance report on the second generation Hallmark cards, the defendants stated: "A dealer who complained that we were wrong to 'copy Blue Mountain Art' apologized and is excited about sales results."

Plaintiffs prepared as an exhibit comparative portional enlargements of various Blue Mountain and Personal Touch cards. The enlargements were virtually identical; so nearly identical as to preclude a finding of coincidence.

■ Where a newcomer adopts a trade dress similar to that of an established manufacturer, even innocently, a failure or refusal to alter the trade dress to avoid confusion is equivalent to an original and actual intention to copy. *American Greetings Corp. v. Dan-Dee Imports*, 619 F.Supp. 1204, 1222 (D.N.J.1985). Furthermore, a finding of intent to copy and "cash in" on the plaintiffs' reputation and goodwill may, standing alone, justify a finding of likelihood of confusion. *Sicilia Di R. Biebow & Co. v. Cox*, 732 F.2d 417, 434 (5th Cir.1984); *Beer Nuts, Inc. v. Clover Club Foods Co.*,

711 F.2d 934, 941 (10th Cir.1983). It is easy for the business which wishes to sell its goods on their merits to select marks, designs and packaging that will not be confused with its competitors. *Chevron Chemical Co. v. Voluntary Purchasing Group*, 659 F.2d 695, 704 (5th Cir.1981).

One who adopts a trade dress similar to another already established in the market place is viewed with suspicion by the courts. *See Beer Nuts, Inc. v. Clover Club Foods*, 711 F.2d 934, 941 (10th Cir.1983). He acts at his peril because the court presumes that he can accomplish his purpose, i.e., the public will be deceived. *Id.* "All doubts must be resolved against him." *Id.*

 I find and conclude that there is substantial evidence to support a finding that Hallmark copied Blue Mountain's cards for the purpose of benefitting from and "cashing in" on Blue Mountain's already established reputation and goodwill. *See John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966 (11th Cir.1983) (using competitor's product as model and designing new product resulting in similar-looking product is sufficient to support finding of intent to copy); *Silverman v. CBS, Inc.*, 632 F.Supp. 1344, 1351 (S.D.N.Y.1983) (unauthorized copying can be proven by (1) access to copyrighted work, and (2) substantial similarity to that work).

The Airebrush and Watercolor Feelings "look" has been in existence for several years. Publicity concerning the look has been extensive and Blue Mountain receives thousands of unsolicited fan letters each year. Indeed, a ceramics manufacturer has purchased from the plaintiffs a license to replicate the Blue Mountain look on mugs and other ceramic products, thus demonstrating that the distinctive look is recognized in the market as having a value separate from the cards.

I find and conclude on a preliminary basis that the Airebrush and Watercolor Feelings cards possess an established and secondary meaning that is being diluted by Hallmark's intentional copying.

### 3. *Likelihood of Confusion.*

 Likelihood of public confusion is the dispositive issue in a Lanham Act case. *Freixenet SA v. Admiral Wine & Liquor Co.*, 731 F.2d 148, 151 (3d Cir.1984). A "digits of confusion" standard sets forth the following factors to be considered in determining whether likelihood of confusion exists: (1) similarity of products, (2) identity of retail outlets and purchasers, (3) identity of advertising media, (4) strength of trade dress, (5) defendant's intent, (6) similarity of design, (7) presence of actual confusion, (8) degree of care likely to be exercised by purchasers, and (9) other evidence showing that consumers are likely to be confused. *Sicilia Di R. Biebow & Co. v. Cox*, 732 F.2d 417, 430 (5th Cir.1984); *Beer Nuts, Inc. v. Clover Club Foods Co.*, 711 F.2d 934, 940 (10th Cir.1983); *American Greetings Corp. v. Dan-Dee Imports, Inc.*, 619 F.Supp. 1204, 1222 (D.N.J.1985).

Consumer survey research is particularly helpful in testing for these digits of confusion. I found the testimony of Abraham Wolf, President of Arbor Inc., convincing consumer survey evidence. Arbor found that buyers of both Hallmark and Blue Mountain cards tended to be women over the age of sixteen. Respondents selected for the Arbor survey, therefore, were women sixteen or older, who had purchased both a Hallmark card and a Blue Mountain card in the past year. Respondents were shown Hallmark Second Generation Personal Touch cards and asked to identify the manufacturer or line of cards. In two phases of the study, 71 percent and 80 percent of the respondents respectively, mistakenly believed the manufacturer to be Blue Mountain.

The Tenth Circuit Court of Appeals has declared, with regard to comparison of trademarks and public confusion:

"In evaluating similarity, '[i]t is axiomatic in trademark law that " side-by-side" comparison is not the test.' The marks 'must be compared in the light of what occurs in the marketplace, not in the courtroom. A prospective purchaser does not ordinarily carry a sample or

specimen of the article he knows well enough to call by its trade name, he necessarily depends upon the mental picture of that which symbolizes origin and ownership of the thing desired.' Therefore, the court must determine whether the alleged infringing mark will be confusing to the public when singly presented." *Beer Nuts, Inc. v. Clover Club Foods Co.*, 711 F.2d 934, 941 (10th Cir. 1983) (citations omitted).

Similarly, the greeting card consumer, when shopping, does not ordinarily carry around a specimen of the kind of card he or she seeks. As demonstrated by the plaintiffs' consumer survey research, confusion is highly likely between a mental picture or recollection of the Blue Mountain look and the second generation Personal Touch cards.

The *Beer Nuts* opinion provides further instruction with regard to applying the factors used in determining likelihood of consumer confusion:

> "Also relevant to likelihood of confusion are the means by which the products are marketed. "Converging marketing channels increase the likelihood of confusion." The possibility of confusion is greatest when products reach the public by the same retail outlets. Confusing similarity is most likely when the products themselves are very similar." *Id.* at 941 (citations omitted).

Converging market channels provided Hallmark's impetus to alter its first generation design. As indicated in company memoranda, Blue Mountain cards posed a severe competitive threat because they were "penetrating" Hallmark channels. Hallmark has unquestionably profited from confusion within the identical channels. *See Isaly Co. v. Kraft Inc.*, 619 F.Supp. 983, 992 (D.C.Fla.1985) (confusion between Klondike bar and other ice cream bar, both sold in similar retail establishments).

The Tenth Circuit in *Beer Nuts* made the following additional observation with regard to public confusion:

> "Finally, the court must examine the degree of care with which the public will choose the products in the marketplace. ' "The general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods, is the touchstone." ' Buyers typically exercise little care in the selection of inexpensive items that may be purchased on impulse. Despite a lower degree of similarity, these items are more likely to be confused than expensive items which are chosen carefully." *Id.* at 941.

Clearly non-occasion greeting cards are relatively inexpensive items that may be purchased on impulse.

Saul Zusman, a cardshop owner, testified that consumers rarely, if ever, flip a card over to read the name of its manufacturer printed on the back. Instead, greeting card sales result from impulse purchases based on the cards' content and design.

Finally, proof of actual confusion is not required to justify either preliminary or permanent relief under the Lanham Act. *American Greetings Corp. v. Dan-Dee Imports, Inc.*, 619 F.Supp. 1204, 1223 (D.C.N. J.1985). It is, however, obviously powerful and persuasive evidence of likely public confusion. Susan Polis Schutz testified that, while visiting a California card shop, even she was confused and deceived into believing a Hallmark card was her own.

 I preliminarily find and conclude, for purposes of preliminary relief, that the Hallmark Personal Touch cards are so substantially similar to the plaintiffs' trade dress, that there exists a likelihood of confusion in the minds of the consuming public.

### 4. *Standards for Preliminary Injunction.*

In order to support preliminary injunctive relief the evidence must demonstrate:

1. Substantial likelihood that the movant will eventually prevail on the merits;

2. That the movant will suffer irreparable injury if the injunction does not issue;

3. That the threatened injury to the movant outweighs whatever damage the injunction may cause the opposing party; and,

4. That the injunction, if issued, would not be adverse to the public interest. *Lundgrin v. Claytor,* 619 F.2d 61 (10th Cir.1980).

In trade dress actions, likelihood of consumer confusion establishes both the requisite probability of prevailing on the merits and the risk of irreparable harm. *Amoco Oil Co. v. Rainbow Snow,* 748 F.2d 556, 558 (10th Cir.1984); *GTE Corporation v. Williams,* 731 F.2d 676, 678 (10th Cir.1984); *Standard & Poor's Corp., Inc. v. The Commodity Exchange Inc.,* 683 F.2d 704, 708 (2d Cir.1982); *By-Rite Distributing Inc. v. The Coca-Cola Co.,* 577 F.Supp. 530, 540–41 (D.C.Utah 1983).

Having tentatively found a likelihood of consumer confusion, I conclude that the plaintiffs have demonstrated a substantial likelihood of success on the merits of their Lanham Act claim and irreparable harm unless an injunction is granted.

The threatened injury to Blue Mountain greatly outweighs any damage the injunction may cause Hallmark. Airebrush and Watercolor Feelings are Blue Mountain's major card lines. The approximately 90 Hallmark Personal Touch cards in issue comprise a small portion of the 11,000 cards and related social expression products such as gift wraps, candles, stationary and party goods distributed by Hallmark through its network of approximately 22,-000 independently owned retail outlets. If Hallmark is allowed to further dilute the Blue Mountain look prior to a trial on the merits, Blue Mountain will be ruined and any success it might gain through trial would be a pyrrhic victory.

Finally, it is in the public interest to enforce the policies of the Lanham Act, to prevent the likelihood of public confusion from becoming an actuality, and to encourage creativity among artists.

Without admitting that some of the Personal Touch cards are not offending, the plaintiffs have suggested that certain of the Personal Touch cards be excluded from the scope of this order since it is a much closer question whether those cards infringe on the plaintiffs' trade dress. As to the remaining 83 Personal Touch cards, the plaintiffs' Motion for Preliminary Injunction is granted.

ACCORDINGLY,

IT IS ORDERED that the defendants Hallmark Cards Incorporated and Hallmark Marketing Corporation are hereby enjoined and restrained, pending a trial on the merits from producing, manufacturing, marketing, advertising, promoting, offering for sale, selling or distributing Second Generation Personal Touch cards 491–2, 502–9, 501–8, 435–9, 420–6, 460–7, 495–9, 501–1, 406–3, 502–4, 440–3, 470–5, 495–3, 495–8, 491–3, 502–0, 446–7, 406–2, 436–0, 405–9, 445–9, 500–8, 450–5, 420–7, 503–5, 445–3, 406–4, 420–8, 502–3, 435–8, 491–1, 501–7, 406–1, 436–2, 446–4, 501–9, 495–4, 500–9, 470–4, 450–4, 470–6, 491–4, 440–4, 501–4, 501–6, 502–7, 446–0, 446–9, 503–2, 503–0, 446–1, 495–6, 461–3, 491–0, 460–9, 502–2, 490–9, 502–5, 461–0, 461–2, 501–5, 436–3, 461–5, 446–3, 446–6, 410–6, 460–8, 446–5, 440–5, 501–2, 502–6, 502–8, 406–0, 503–4, 446–8, 502–1, 501–3, 461–1, 495–5, 430–4, 495–7, 503–1, 461–4.

It is unnecessary at this preliminary stage to address the plaintiffs' pendent state law unfair competition claims. Plaintiffs' request for attorneys fees is reserved until after trial.