**STUDIO 1712, INC., a Colorado corporation, Plaintiff,**

v.

**ETNA PRODUCTS CO., INC., et al., Defendants.**

No. 90–C–1985.

United States District Court, D. Colorado.

Nov. 6, 1991.

Daniel Lynch, Denver, Colo., for plaintiff.

Steve Briggs, Boulder, Colo., Marcy Stuzin, New York City, for defendants.

### FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

CARRIGAN, District Judge.

Plaintiff Studio 1712, Inc. (Studio 1712) commenced this action asserting, *inter alia*, trade dress infringement under the Lanham Act, 15 U.S.C. § 1125(a). Defendants are Etna Products Co., Inc. (Etna), Harriet Carter Gifts, Inc. (Harriet Carter) and Hanover House Industries, Inc. (Hanover House). Currently pending is the plaintiff's motion for preliminary injunction pursuant to Fed.R.Civ.P. 65(a). Defendants have responded by opposing the motion. Jurisdiction exists under 28 U.S.C. § 1331.

Plaintiff asserts that the defendants have infringed the trade dress of its product, the Bangle–Hangall, a wall-mounted jewelry organizer. Etna imports and sells a similar, wall-mounted jewelry organizer known as the "Jewelry Hang–All" that is distributed by Harriet Carter and Hanover House. Plaintiff seeks a preliminary injunction prohibiting the defendants from selling the Jewelry Hang–All, and requiring the defendants to notify purchasers of the product that further sales are prohibited until a trial on the merits.

The parties have fully briefed the issues, and an evidentiary hearing has been held. This memorandum constitutes my findings of fact, conclusions of law and order as required by Fed.R.Civ.P. 52(a).

### I. Findings of Fact.

Studio 1712 is a Colorado corporation founded in 1988. Its sole product is the "Bangle–Hangall." Etna is a New Jersey corporation whose business is importing and selling, to mail order companies and wholesalers, novelty and gift items. Harriet Carter and Hanover House are Pennsylvania corporations engaged in selling novelty and gift items through catalogs that they publish and distribute nationally.

Studio 1712 was founded by its current president Cherl A. Meyer. A graphic designer prior to forming that company, Meyer originated the idea of a wall-mounted jewelry organizer. She employed several engineers and a plastic mold expert to assist her in developing the Bangle–Hangall.

After constructing a working prototype of her product, Meyer solicited funds from several friends to finance production. Each investor receives royalty payments at regular intervals. Royalties are calculated as percentages of customer payments for final sales.

The Bangle–Hangall is made of transparent, purple-tinted plastic and consists of a head piece and three storage trays in which removable dividers may be inserted to create a maximum of thirty-six compartments for storing jewelry. Attached at the product's bottom is a single row of nine rounded pegs for hanging necklaces and similar items.

The Bangle–Hangall's headpiece measures two and one-half inches wide by nine and one-half inches in length. It has inlaid designs on both ends, rounded corners with a double rounded arch on one end, and two holes through which screws may be inserted to affix the device to a wall.

The storage trays and the row of pegs, whose dimensions by necessity are similar to that of the head piece, are attached to one another by means of a design that allows each to rotate slightly. The product, as sold, contains three storage trays, but its design allows additional trays to be attached.

Plaintiff began marketing and selling its product in 1988. Because of financial constraints, free publicity was a source of early advertising. At times, the plaintiff also has purchased magazine and newspaper advertising.

Studio 1712's initial marketing strategy included attempting to sell the Bangle–Hangall through mail-order catalogs. Janice Brady, a certified public accountant who was responsible for Studio 1712's marketing and accounting from 1988 until she resigned in early 1990, maintained "contact sheets" that detailed the history of that marketing effort with various catalog houses. Brady contacted several major gift catalog houses, including the defendants Harriet Carter and Hanover House.

Prior to 1990, the Bangle–Hangall was marketed nationwide through catalogs distributed by Starcrest and Suarez, both California catalog companies. Drug stores and certain specialty shops also marketed Studio 1712's product.

Brady first contacted the defendant Harriet Carter in 1988. At Harriet Carter's request, Brady sent the company a sample of the Bangle–Hangall on March 27, 1989. (Plaintiff's Ex. 35).

Brady first contacted the defendant Hanover House in February 1989. John Diers, Hanover House's vice-president, was Brady's main contact. At Diers' request, Brady sent a sample of the Bangle–Hangall to him on March 28, 1989. (Plaintiff's Ex. 36). She responded to his request for further merchandise information the following month. *Id.*

In early 1990, Diers contacted Jeffery Snyder, an Etna executive, inquiring whether a product similar to the Bangle–Hangall could be produced, and requesting that one be produced for future sale in the Hanover House catalog. Diers provided Etna a picture of the Bangle–Hangall that Etna forwarded to a Hong Kong manufacturing company. Etna has conceded that, other than Studio 1712's and its own products, it is aware of no other clear plastic, wall-mounted jewelry organizer.

The Hong Kong company assured Etna that it could produce an item similar to the Bangle–Hangall. Testimony at the hearing established that Etna's Hong Kong manufacturer used the Bangle–Hangall as a model for designing the Jewelry Hang–All.

Etna began importing and selling the Jewelry Hang–All in 1990. In product orders sent to the Hong Kong manufacturer, Etna has referred to the item ordered as the "Bangle Jewelry Organizer." Etna sells the Jewelry Hang–All primarily through catalog sales companies, including Harriet Carter and Hanover House.

The Jewelry Hang–All is made of transparent plastic and consists of a head piece and three storage trays in which removable dividers may be inserted to create a maximum of thirty-six compartments for storing jewelry. Attached at the product's bottom is single row of nine pegs for hanging necklaces and similar items.

The Jewelry Hang–All's headpiece measures roughly two and one-half inches wide by nine and one-half inches in length. It has inlaid designs and double rounded arches on both ends. Two holes are provided so that screws may be inserted to affix the device to a wall.

The storage trays and the row of pegs, whose dimensions by necessity are similar to that of the head piece, are attached solidly to the headpiece. The product, as sold, contains three storage trays. Its design prohibits appending additional trays.

Plaintiff first became aware of the Jewelry Hang–All in the summer of 1990 when Meyer's friend, Carol Fregg, who had seen Etna's product in a catalog, telephoned Meyer to inquire whether the Jewelry Hang–All was, in fact, the Bangle–Hangall.

Testimony and documents submitted at the hearing establish that Studio 1712, whose income derives exclusively from sales of the Bangle–Hangall, was a profitable company from shortly after its inception until 1990. Sales of its product increased consistently throughout that period. Since 1990, however, Studio 1712's gross income has dropped significantly, it is no longer profitable and it currently borders on insolvency. Records of royalty payments reflect the company's declining financial status. (Plaintiff's Ex. 40).

Starcrest and Suarez, the catalog companies that previously sold the plaintiff's product, have dropped it from their catalogs since the Jewelry Hang–All arrived on the market. The Bangle–Hangall now is sold only through drug and specialty stores.

Etna has sold approximately 11,000 units of the Jewelry Hang–All since its introduction in 1990. Defendants Harriet Carter and Hanover House list that product in their respective sales catalogs. Collectively, the defendants offer for sale thousands of different products, and have in excess of $200 million in gross annual sales.

Plaintiff commenced this action on November 6, 1990. On April 24, 1991, it filed the instant motion for preliminary injunction.

## II. Conclusions of Law.

A party seeking a preliminary injunction must establish: (1) that there is a substantial likelihood that it will prevail on the merits; (2) that it will suffer irreparable harm if an injunction is not granted; (3) that the threatened injury to the movant outweighs any damage the injunction might cause the opposing party; and (4) that the injunction, if issued, will not adversely affect the public interest. *Lundgrin v. Claytor*, 619 F.2d 61, 63 (10th Cir.1980).

### A. Likelihood of Prevailing on the Merits.

An action for unprivileged imitation, including trade dress infringement, is available under the Lanham Act, 15 U.S.C. § 1125(a). *Brunswick Corp. v. Spinit Reel Co.*, 832 F.2d 513, 516–17 (10th Cir. 1987). Trade dress refers to the appearance of the product itself, to a complex of its features. *Hartford House, Ltd. v. Hallmark Cards, Inc.*, 846 F.2d 1268, 1271 (10th Cir.), *cert. denied*, 488 U.S. 908, 109 S.Ct. 260, 102 L.Ed.2d 248 (1988). Relevant features comprising a product's trade dress include size, color, graphics and the arrangement of the product's functional elements. *Id.* (*quoting SK & F Co. v. Premo Pharmaceutical Laboratories, Inc.*, 481 F.Supp. 1184, 1187 (D.N.J.1979)). Trade dress is a term reflecting the overall visual or tactile impact a product conveys when all of its features are taken together. *Id.*

To prevail on a trade dress infringement claim, a plaintiff must prove: (1) that the trade dress, whether a single feature or a combination of features, is non-functional; (2) that the trade dress has acquired a secondary meaning; and (3) that there is a likelihood of confusion among consumers as to the source of the competing products. *Hartford House*, 846 F.2d at 1271; *Brunswick*, 832 F.2d at 517.

#### 1. Functionality.

Trademark law protection extends to a product's fanciful or arbitrary features, *i.e.*, its non-functional features, that have achieved recognition as an indicia of origin. *Keene Corp. v. Paraflex Industries, Inc.*, 653 F.2d 822, 824 (3d Cir.1981). The creation and arrangement of individual product features into a particular overall design may constitute a non-functional product feature. *Hartford House*, 846 F.2d at 1272 (*quoting Hartford House,*

*Ltd. v. Hallmark Cards, Inc.,* 647 F.Supp. 1533, 1539 (D.Colo.1986)). Indeed, a combination of features may be non-functional and thus protectable even though the combination includes functional features. *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.,* 826 F.2d 837, 842 (9th Cir.1987). If a feature is non-essential, however, and serves to identify the source of the goods, it is clearly protectable trade dress. *United States Golf Asso. v. St. Andrews Systems, Data–Max, Inc.,* 749 F.2d 1028 (3d Cir.1984).

▆▆▆ When, as here, a combination of product features form the trade dress allegedly infringed, the appropriate inquiry is whether the product's features taken collectively are functional. *Hartford House,* 846 F.2d at 1272; *Fuddruckers,* 826 F.2d at 842. The test for determining functionality is whether protecting the combination of product features would hinder competition or impinge upon the rights of others to compete effectively. *Hartford House,* 846 F.2d at 1273. A significant element of the test is whether alternative appealing designs or presentations of the product could be developed. *Id. (quoting Brunswick,* 832 F.2d at 519).

▆▆▆ As is to be expected of almost any product, the Bangle–Hangall incorporates both functional and non-functional features. However, it has an inherently distinctive and highly uniform "look" that is recognizable and attributable to Studio 1712. The following elements comprise that look or trade dress:

1. A transparent plastic construction consisting of a head piece followed in vertical order and attached to which are three storage trays and a bottom row of pegs.

2. Three half-round storage trays that each can be divided into twelve separate compartments by means of removable dividers for a collective total of thirty-six compartments.

3. Nine pegs that comprise the bottom peg row.

4. Inlaid designs on both ends of the headpiece consisting primarily of straight lines leading to rounded curves and circles.

5. Rounded headpiece corners with a double rounded arch on one end.

6. The provision of two holes in the headpiece for affixing the device to a wall.

7. The headpiece dimension of approximately two and one-half inches by nine and one-half inches.

8. Overall dimensions of eleven inches by nine and one-half inches.

Many of the Bangle–Hangall features incorporate both functional and non-functional elements. The headpiece, for example, is incorporated into the product primarily as an arbitrary design feature, but its provision of holes for affixing the device reflects a functional capacity. The curvature of the storage trays, while a part of the product's look, facilitates removing items stored in them. Similarly, while the row of pegs necessarily must be attached at the product's bottom so that necklaces and bracelets may hang from them, the decision to provide *nine* pegs, and, indeed, *thirty-six* storage compartments, represent arbitrary design decisions that necessarily reflect on the product's look or feel.

Clearly, certain of the Bangle–Hangall's features are solely functional. However, viewing as a whole the product's features—functional, non-functional and quasi-functional—the design and amalgamation of those features in a uniform fashion has produced the non-functional Bangle–Hangall "look."

Further evidence that the features developed by the plaintiff are non-functional are the numerous alternative designs available to the defendants. The Bangle–Hangall's headpiece is primarily non-functional, and its design, incorporating a double rounded arch and distinctive inlaid designs, inarguably reflects arbitrary, non-functional aspects of the design. Multiple means of affixing the device to walls are available. Likewise arbitrary are the decisions to use three storage trays, thirty-six storage compartments and nine pegs, as previously noted. The dimensions of the headpiece and the product overall are not mandatory de-

sign features. Nevertheless, the Jewelry Hang–All duplicates each of these non-functional, arbitrary design features in exacting detail.

In sum, this is not a case where there are a limited number of designs available, thus mandating a finding of functionality. *See Keene Corp. v. Paraflex Indus., Inc.*, 653 F.2d 822 (3d Cir.1981). For the above reasons, I conclude, for purposes of preliminary injunctive relief, that the Bangle–Hangall's features are primarily non-functional.

### 2. Secondary Meaning.

 Plaintiff further must establish that the Bangle–Hangall's "look" possesses a secondary meaning. Secondary meaning refers to the primary significance of the product's features to identify, in the minds of the public, the product's source rather than the product itself. *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 850–51 n. 10, 102 S.Ct. 2182, 2186–87 n. 10, 72 L.Ed.2d 606 (1982).

 Trade dress distinctiveness largely determines the protection a product is afforded under the Lanham Act. *Beer Nuts, Inc. v. Clover Club Foods Co.*, 711 F.2d 934 (10th Cir.1983). Inherently distinctive trade dress is proof of secondary meaning. *Id.; Hartford House*, 647 F.Supp. at 1541. Moreover, proof that a particular trade dress was copied may be sufficient in and of itself to establish secondary meaning because there is no reason to copy a non-functional feature except to capitalize on an already existing secondary meaning. *Transgo Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1011 (9th Cir.1985), *cert. denied*, 474 U.S. 1059, 106 S.Ct. 802, 88 L.Ed.2d 778 (1986); *Ideal Toy Corp. v. Plawner Toy Mfg. Corp*, 685 F.2d 78, 82 (3d Cir.1982). Courts view with suspicion one who adopts a trade dress similar to that of another product already existing in the market place. *Beer Nuts*, 711 F.2d at 941.

Particularly probative evidence of secondary meaning were the admissions and statements at the hearing of Etna's general manager, Semore Shapiro. Shapiro admitted that Etna had received a picture of the Bangle–Hangall from Hanover House's vice-president John Diers. Shapiro further testified that Etna had forwarded that picture to its Hong Kong manufacturing associate with specific instructions to develop a like product.[1] Further, Etna has conceded that, prior to obtaining the picture of the Bangle–Hangall, it knew of no similar wall-mounted jewelry organizer.

In light of these admissions, as well as the obvious and overwhelming similarities between the plaintiff's product and the product finally produced for Etna, I conclude that Etna intended to, and in fact did, use the Bangle–Hangall as a model for designing its product. I further conclude that there is substantial evidence to support a finding that Etna copied the plaintiff's product for the purpose of benefitting from and "cashing in" on Studio 1712's already established market and goodwill. *See John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966 (11th Cir.1983) (using competitor's product as model for new product sufficient to support finding of intent to copy).

It was and is feasible for Etna to avoid potential confusion and compete effectively without having to slavishly copy or imitate the distinctive combination of features comprising the Bangle–Hangall's trade dress. Defendants Harriet Carter and Hanover House have benefitted from that copying to the extent it has facilitated sales of Etna's product through their catalogs.

Accordingly, I find and conclude on a preliminary basis that the Bangle–Hangall possesses a secondary meaning that is being diluted by the defendants' intentional copying of it and their sales of the Jewelry Hang–All.

### 3. Likelihood of Confusion.

 Plaintiff also must demonstrate that there is a likelihood of confusion

---

**1.** I find not credible, and therefore disregard, Shapiro's testimony that Etna instructed its Hong Kong manufacturer to copy only the functional, not the non-functional, aspects of the Bangle–Hangall.

among consumers as to the source of its product and Etna's. The following factors, among others, are to be considered in determining whether likelihood of confusion exists: (1) similarity of products; (2) identity of retail outlets and purchasers; (3) identity of advertising media; (4) strength of trade dress; (5) the defendants' intent; (6) similarity of design; (7) presence of actual confusion; (8) degree of care likely to be exercised by purchasers; and (9) other evidence showing consumers are likely to be confused. *Sicilia Di R. Biebow & Co. v. Cox*, 732 F.2d 417, 430 (5th Cir.1984); *Beer Nuts*, 711 F.2d at 940; *Hartford House*, 647 F.Supp. at 1543.

■■■ Also relevant to likelihood of confusion are the means by which the products are marketed. *Beer Nuts*, 711 F.2d at 941. Converging marketing channels increase the likelihood of confusion when the products are very similar. *Id.*

■■■ With regard to comparison of trademarks and public confusion, the Tenth Circuit Court of Appeals has declared that "[p]roof that a defendant chose a mark with the intent of copying plaintiff's mark, standing alone, may justify an inference of confusing similarity." *Beer Nuts*, 711 F.2d at 941 (*quoting Sun–Fun Products, Inc. v. Suntan Research & Development Inc.*, 656 F.2d 186, 190 (5th Cir.1981)). Proof of actual confusion is not required to justify preliminary relief under the Lanham Act. *American Greetings Corp. v. Dan–Dee Imports, Inc.*, 619 F.Supp. 1204, 1223 (D.N.J.1985).

The products in this case are almost identical in all respects relevant to trade dress. No product like or other than the plaintiff's existed on the market prior to Etna's introduction of the Jewelry Hang–All. As noted, the evidence is unrefuted that Etna copied the Bangle–Hangall as the model for designing its product. Etna's decision intentionally to reproduce the panoply of distinctive features comprising the trade dress of the plaintiff's product alone justifies an inference of public confusion. *Beer Nuts*, 711 F.2d at 941.

Evaluating public confusion in the trademark context, the Tenth Circuit has indicated that:

> "In evaluating similarity, '[i]t is axiomatic in trademark law that "side by side" comparison is not the test.'... 'A prospective purchaser does not ordinarily carry a sample or specimen of the article he knows well enough to call by its trade name, he necessarily depends upon the mental picture of that which symbolizes origin and ownership of the thing desired.' Therefore, the court must determine whether the alleged infringing mark will be confusing to the public when singly presented." *Beer Nuts*, 711 F.2d at 941 (citations omitted).

Similarly, those who seek to purchase a Bangle–Hangall must depend on a mental picture of the product and of those unique aspects of it that symbolize its origin or source of manufacture. Evidence introduced at the hearing supports an inference of public confusion. As noted, the plaintiff's president's friend, who was familiar with the Bangle–Hangall, discovered the infringement here alleged when she saw a catalog advertisement of Etna's product and mistook it as the plaintiff's. While no consumer survey evidence of actual confusion was introduced,[2] the evidence demonstrates a likelihood of confusion between a mental picture or recollection of the Bangle–Hangall and the Jewelry Hang–All when singly presented to the public.

The channels through which the instant products are, or have been, marketed also are relevant to the likelihood of confusion inquiry. *Beer Nuts*, 711 F.2d at 941. Plaintiff expended considerable effort to market its product through national catalogs, successfully placing the product in two catalogs. Etna sells its product pri-

---

**2.** Nor could introduction of it be expected, at least at this point in the case. Buyers of these products constitute, in marketing terms, a well-defined, narrow market niche or group of purchasers who reside at diverse places throughout the country. Moreover, while consumer survey research may be helpful to the final disposition of this case, evidence of actual confusion is unnecessary for purposes of granting preliminary relief. *American Greetings*, 619 F.Supp. at 1223.

marily through similar, nationally distributed catalogs, including those of the defendants Hanover House and Harriet Carter.

While the Bangle–Hangall has since been dropped by its former catalog distributors (allegedly because Etna introduced its product in competing catalogs), the likelihood of public confusion is greatest when, as here, products are extremely similar and reach the consuming public at a time relevant to the alleged infringement by the same means of distribution. *See Beer Nuts*, 711 F.2d at 941; *see generally Exxon Corp. v. Texas Motor Exchange, Inc.*, 628 F.2d 500, 505–06 (5th Cir.1980).

For the above reasons, I find and conclude, for purposes of preliminary relief, that the Jewelry Hang–All is so substantially similar to the plaintiff's product's trade dress, that there exists a likelihood of confusion in the minds of the consuming public.

### B. Irreparable Injury.

■■ I have determined above that the plaintiff is likely to prevail on the merits and, as a sub-part of that determination, that a likelihood of consumer confusion exists. In trade dress actions, a finding of likelihood of confusion establishes the second preliminary injunction prerequisite that there exists a substantial risk of irreparable harm. *Hartford House*, 647 F.Supp. at 1545 (*citing, inter alia, Amoco Oil Co. v. Rainbow Snow*, 748 F.2d 556, 558 (10th Cir.1984)). Evidence introduced at the hearing indicates dilution of the plaintiff's market niche has been ongoing since introduction of Etna's product. That evidence provides additional support for concluding that Studio 1712 will suffer irreparable harm if an injunction does not issue.

■■ Defendants argue, however, that the plaintiff's delay in seeking preliminary relief undercuts any presumption that the alleged infringement will cause irreparable injury, citing, among other cases, *GTE Corp. v. Williams*, 731 F.2d 676, 679 (10th Cir.1984); *Citibank N.A. v. Citytrust*, 756 F.2d 273, 276–77 (2d Cir.1985); and *Majorica, S.A. v. R.H. Macy & Co.*, 762 F.2d 7, 8 (2d Cir.1985). Those cases hold that "significant delay" in moving for a preliminary injunction *may* be a factor in the irreparable injury determination. *Id.* (all cites).

Each cited case is distinguishable. *GTE* and *Majorica, supra,* involved delays of several years. Similarly, *Citibank,* involved a delay of ten weeks from the time the plaintiff, Citibank, directly learned of the alleged infringing activity and more than nine months from the time it received notice of that activity in the press. *Citibank*, 756 F.2d at 276. Other evidence showed Citibank may have received notice *four years* prior to filing its preliminary injunction motion. *Id.* at 277. The *Citibank* court noted that "[i]t strains one's credulity to argue that a major financial institution such as Citibank, with all its resources and information services" could not have earlier detected that infringing activity. *Id.*

I conclude that the evidence before me does not establish that Studio 1712 unduly delayed filing its motion for preliminary injunction. It commenced this action about four months after learning that Etna's product was being offered for sale, and about six months later filed the instant motion. I accept as reasonable under the circumstances the plaintiff's counsel's assertion that those delays were caused by Studio 1712's dire financial circumstances and counsel's need to acquaint himself with the law so that he could, within the bounds of Fed.R.Civ.P. 11, file the instant motion. I therefore have accorded the delay only slight weight in reaching my conclusion that a risk of irreparable harm has been sufficiently established to justify preliminary relief.

### C. Remaining Requirements for Preliminary Injunction.

■■ The third preliminary injunction requirement, that the threatened injury to Studio 1712 outweigh the damage the injunction may cause the defendants, also has been established. As noted, the defendants collectively market thousands of products and reap over $200 million in annual gross sales. Enjoining future sales of the Jewelry Hang–All until a final disposi-

tion of this action will not have a negligible effect on the defendants' overall fiscal performance.

Studio 1712, on the other hand, sells only the Bangle–Hangall, and the corporation's continued viability is clearly in jeopardy if the requested injunction is not issued. If Etna and the other defendants are allowed further to dilute the Bangle–Hangall "look" prior to a trial on the merits, Studio 1712 likely will be forced into bankruptcy and any trial victory would be pyrrhic.

 Finally, it is in the public interest to enforce the policies of the Lanham Act, to prevent the likelihood of confusion from becoming an actuality, and to protect Studio 1712 from what, at this preliminary stage, appears to be intentional copying by a competitor attempting to profit from the plaintiff's creative efforts.

Accordingly, IT IS ORDERED that:

(1) the plaintiff's motion for preliminary injunction is granted;

(2) the defendant Etna Products Co., Inc. is hereby restrained and enjoined, pending a trial on the merits, from selling or offering for sale its product, the Jewelry Hang–All, to any catalog company or other entity or person through whom it may be offered for sale to the general public;

(3) within eleven days of the date of this order the defendant Etna Products Co., Inc., shall send written notice by certified mail to each catalog company, entity or person to whom it sells or has sold the Jewelry Hang–All informing them of this court's order prohibiting sales of that product until a trial on the merits. Etna shall file copies of such notices together with certifications of service with the clerk of this court within thirty days after the date of this order;

(4) the defendants Harriet Carter Gifts, Inc. and Hanover House Industries, Inc. are hereby restrained and enjoined from selling the Jewelry Hang–All, and are ordered to notify in writing any person or entity hereafter ordering that product that its sale has been enjoined by this court;

(5) the parties and their counsel are ordered to meet and confer within eleven days of this order in a good faith attempt to settle the case without further litigation, expense or delay. The parties shall report to this court in writing within fifteen days of this order, stating the results of their settlement negotiations and whether a settlement conference before a Magistrate Judge, or some other alternative dispute resolution proceeding, would facilitate settlement.